IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

TIFFANYE BREEDLOVE as personal
representative of the estate of Torey Breedlove,
deceased, TAMESHA PRINCE                    Case   No.:   6:11-CV-991-ORL-28-
GJK
on behalf of T.B.1, SHARELLE TYSON          DISPOSITIVE MOTION
on behalf of T.B.2, and TERESA
JONES on behalf of T.B.3 and T.B.4,

      Plaintiffs,

v.

HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY,

      Defendant.

_____/

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
AND INCORPORATED MEMORANDUM OF LAW**

**I.  INTRODUCTION**

Plaintiffs have sued Hartford Life and Accident Insurance Company ("Hartford")

for breach of an accidental death insurance policy following the death of Torey

Breedlove ("Breedlove") due to multiple gunshot wounds sustained during an altercation

with police.   That night, the police were investigating and surveilling Breedlove in

connection with the theft of a Dodge Ram truck.   The police watched as Breedlove drove

the stolen truck into an Orlando apartment complex where he had left his own vehicle, a

GMC Yukon Denali, and then watched as he got into the Denali.   Two officers, who were

undercover (not in uniform) but wearing tactical vests identifying them as being with the

Orange County Sheriff's Office, ordered Breedlove to stop at gunpoint. Breedlove did not comply. Instead, he floored his Denali in reverse out of the parking spot, crashed into an unmarked police vehicle that was attempting to block him in, and drove away. Breedlove rounded the corner of the parking lot, running into resident vehicles parked at the complex, and then backed the Denali up to make another attempt at escape. However, another unmarked police vehicle went nose-to-nose with the Denali before Breedlove could go any further.

Police testimony indicates that Breedlove was ordered to stop, and when Breedlove did not comply, police fired a volley of shots at the Denali. Breedlove then appeared to surrender. The police again ordered him to stop but Breedlove accelerated again with his tires pointed in the direction of officers on foot seeking to apprehend him. Breedlove was shot during a second volley of gunfire by officers in fear for their own safety or the safety of others.

Plaintiffs dispute the police account of the incident with testimony given by an apartment complex resident, Demetres Baker, who allegedly witnessed the shooting. Ms. Baker testified that she thought Breedlove was being carjacked or robbed. However, Ms. Baker did not see the Denali until it had gotten to the corner of the parking lot where Breedlove backed up, and therefore, her testimony does not establish any genuine issue of material fact as to events that occurred before Breedlove hit the parked cars in the complex and then backed his Denali up. Moreover, Ms. Baker's testimony regarding what happened after Breedlove backed his Denali up actually tracks that of the police officers - there were two volleys of gunfire with a pause in between, during which time

Breedlove's hands were up.  Ms. Baker admits she could not hear what Breedlove said to police at that time because she was engaged in a shouting match with the police officers she believed to be carjackers, and she did not see what happened thereafter because she ran from the scene believing the police officers were shooting at her.

The policy requires plaintiffs to prove that an "Injury," defined as "bodily injury resulting directly from accident and independently of all other causes," caused Breedlove's death before benefits are payable.  The policy also excludes from coverage any loss resulting from "Injury sustained while committing or attempting to commit a felony."  In this case, Breedlove's death does not constitute an "Injury" because he intentionally placed himself into a dangerous situation and because he acted as an aggressor.  For these reasons, his death was both foreseeable and not by chance, and therefore, did not result from an accident independent of all other causes.  Moreover, Breedlove's death was specifically excluded from coverage under the policy because his death occurred during the commission of one or more felonies.  Accordingly, Hartford is entitled to summary judgment on the entirety of plaintiffs' claims.

## II.  STATEMENT OF UNDISPUTED MATERIAL FACTS[1]

### A.  The Policy

Torey Breedlove was insured under a group accidental death and dismemberment insurance policy issued by Hartford to Publix Employees Federal Credit Union (the

---

[1]      This statement is derived from the pleadings, the declarations/affidavits attached hereto, the certified copies of public records attached hereto, and the deposition testimony of Sergeant Michael Davis ("Davis Dep."), Demetres Baker ("Baker Dep."), and Robert Ketchum ("Ketchum Dep.").  The deposition testimony is being filed contemporaneously with this Motion.

"Policy").  First Am. Compl. [DE 23], ¶ 10 and Exh. B.  Breedlove was eligible to enroll

for coverage under the Policy by virtue of his status as an accountholder at the credit

union. *Id.*

      The Policy provides as follows with respect to its basic and voluntary coverages:

      **ACCIDENTAL DEATH AND DISMEMBERMENT BENEFIT
(BASIC PLAN – INSURED PERSON ONLY)**  If Your Injury results in
any of the following losses [including death] within 365 days after the date
of accident, We will pay the sum stated ….

      **ACCIDENTAL DEATH AND DISMEMBERMENT BENEFIT
(VOLUNTARY PLAN)**  If a Covered Person's Injury results in any of
the following losses [including death] within 365 days after the date of
accident, We will pay the sum stated ….

First Am. Compl., Exh. B at p. 4.[2]  Injury is defined as "bodily injury resulting directly

from accident and independently of all other causes."  *Id.*  The Policy also specifically

excludes from coverage any "Injury sustained while committing or attempting to commit

a felony."  *Id.*

    **B.  Factual Overview**

      In the early morning hours of January 5, 2010, members of the Orange County

Sheriff's Office ("OCSO") were conducting physical and electronic surveillance on a

stolen Dodge Ram (the "stolen truck").  Davis Dep. p. 17 l. 9 to p. 19 l. 1.  The stolen

truck had been found on January 4, 2010 parked in the Alta Westgate apartment complex

(the "Complex") in Orlando, Florida, and a tracking device was installed on it.  *Id.*;

Affidavit of Deputy Richard Schmeltzer ("Schmeltzer Aff."), attached as **Exhibit B**, at ¶

4.  The ignition of the stolen truck had been removed and placed back in, meaning that

---

[2]      A copy of the Policy is also attached as **Exhibit A**.

the ignition mechanism was bypassed.[3]  Schmeltzer Aff. at ¶ 5.  Sergeant Michael Davis,

supervisor of the OCSO Auto Theft Unit, was coordinating the efforts of five officers

inside the Complex and five officers outside the Complex from his location at the front of

the Complex.[4]  Davis Dep. p. 4 l.22 to p. 5 l. 16, p. 18 ll. 21-23.  Breedlove was a suspect

in a series of tire and rim thefts from 2009 involving the use of stolen Dodge Ram trucks

to transport the tires and rims.  *Id.* at p. 7 l.10 to p. 8 l. 4.

   At approximately 2:00 a.m. on January 5, 2010, the tracking device on the stolen

truck alerted OCSO that it was on the move from its location at the Complex.  Schmeltzer

Aff. at ¶ 6; Affidavit of Deputy Paul Volkerson ("Volkerson Aff."), attached as **Exhibit

D**, at ¶¶ 3-4.  Breedlove's personal vehicle, a GMC Yukon Denali SUV (the "Denali"),

was also found at the same Complex near where the stolen truck had originally been

parked.  Davis Dep. at p. 18 ll. 4-8, p. 19 ll. 10-15; Affidavit of Deputy John Leone

("Leone Aff."), attached as **Exhibit E**, at ¶¶ 3-4.  OCSO planned to await the return of

the stolen truck and apprehend the suspect.  Davis Dep. at p. 18 ll. 15-18.  For

approximately three hours, the stolen truck was tracked, using both electronic and

physical surveillance, as it traveled into Seminole County and back into Orange County,

---

[3]     To bypass or "punch" the ignition of a Dodge Ram like this one, all that is needed
is a flathead screwdriver.  The screwdriver is used to pry the off the ignition housing,
then used again to pry and dislodge the ignition mechanism itself; once that is out, the
screwdriver is used to start the car by sticking it into a slot inside (where the mechanism
was) and twisting it forward.  Davis Dep. at p. 54 l. 18 to p. 55 l. 17; *see also* Schmeltzer
Aff. at ¶ 4 (the stolen truck was a 2003 model).

[4]     A site plan accurately depicting the layout of the Complex, Davis Dep. at p. 39 ll.
15-23 and Exh. 5, is attached as **Exhibit C**.  The entrance to the Complex on Hiawassee
Road was the only way in or out of the Complex.  Davis Dep. at p. 41 ll. 16-25.

making periodic stops in subdivisions or apartment complexes for ten to twenty minutes at a time.  Volkerson Aff. at ¶9; Davis Dep. at p. 17 l. 16 to p. 18 l. 21.

The stolen truck returned to the Complex at approximately 5:00 a.m.  Davis Dep. at p. 18 ll. 20-21, pp. 43 l. 21 to p. 44 l.5.  The stolen truck parked in front of Building 9, four spots to the south of where the Denali was parked.  Leone Aff. at ¶12.  On a diagram representing the parking lot area in front of Buildings 8 and 9 at the Complex and on which the legend indicates north is the top of the diagram, the stolen truck is the southern-most car in a parking spot.  *Id.* at ¶ 12, Exh. 2.  From their cars, Deputy Leone and Detective Jason Gorberg both observed that the person parking the stolen truck was Breedlove, and they watched him get out of the driver's side of the stolen truck.  *Id.* at ¶ 6; Affidavit of Detective Jason Gorberg ("Gorberg Aff."), attached as **Exhibit F**, at ¶ 7.  Detective Gorberg saw Breedlove open the back gate of the stolen truck, and Deputy Leone saw Breedlove walk with one or more items in his hands to the Denali and open its back hatch.  Gorberg Aff. at ¶ 7; Leone Aff. at ¶ 7.  Deputy Leone then gave the command for other deputies to move in if they had not already begun to do so.  Leone Aff. at ¶ 7.

Upon hearing the command, Detective Gorberg reversed his car into a position behind the stolen truck to block it in.  Gorberg Aff. at ¶ 8.  When Detective Gorberg started his engine, Breedlove began to move quickly, closed the back hatch of his Denali, and started his engine.  Leone Aff. at ¶ 8.  From the time that Breedlove left the stolen truck until he got into the Denali, Deputy Leone never lost sight of him.  *Id.* at ¶ 9.  At this point, both Detective Gorberg and Deputy Leone approached the Denali with their

weapons drawn.  Gorberg Aff. at ¶¶ 9-10; Leone Aff. at ¶¶ 10-11.  Each was wearing their Orange County Sheriff's tactical vest which is black with the word "SHERIFF" written in white letters on the front and back, and a star on the front.  Leone Aff. at ¶¶ 4, 10, Composite Exh. 1; Gorberg Aff. at ¶¶ 5, 9.  Detective Gorberg approached from the driver's side of the Denali until he was at the driver's side window.  Gorberg Aff. at ¶¶ 10, 12.  Deputy Leone approached from the front of the Denali and was standing on a raised parking island directly in front of the Denali's parking spot.  Leone Aff. at ¶¶ 11-12, Exh. 2.  Deputy Leone began yelling "Police, put your hands up" and made eye contact with Breedlove.  *Id.* at ¶ 11.  Detective Gorberg was giving Breedlove commands to the effect of "Get your hands up.  Show me your hands."  Gorberg Aff. at ¶ 10.

Detective Gorberg saw one of Breedlove's hands drop out of sight, at which point Breedlove floored his Denali in reverse out of the parking spot.[5]  Gorberg Aff. at ¶ 11.  Detective Gorberg continued to yell commands for Breedlove to stop, but Breedlove did not comply.  *Id.* at ¶12.  Detective Gorberg was in close proximity to the Denali near the driver's side window and feared that he would be hit when the Denali was floored in reverse.  *Id.*

---

[5]     Plaintiffs' expert, Robert Ketchum, agrees that the Denali's accelerator had been floored to its maximum position when Breedlove was backing out of his parking spot. Ketchum Dep. at p. 28 l. 19 to p. 29 l. 25, p. 30 l. 20 to p. 31 l. 5, p. 41 l. 5 to p. 42 l. 12. Mr. Ketchum bases this opinion on information recorded by the Denali's airbag control module ("ACM"), which verified that a non-deployment event (i.e., a collision) took place and indicated that at most 5 seconds before the collision, the Denali was at 100% throttle.  *Id.*  The only collision significant enough to have caused the ACM to record the non-deployment event was the one between the Denali and Deputy Schmeltzer's vehicle. *Id.* at p. 45 l. 6 to p. 46 l. 16.

At this time, Deputy Schmeltzer was in his unmarked silver Ford Explorer and was driving south away from Building 8 and toward the Denali. Schmeltzer Aff. at ¶¶ 7-8. He was going to block the Denali in by parking behind it, but before he could get there, the Denali collided with his Explorer. *Id.* at ¶¶ 7-9. At this time, Deputy Volkerson (in an unmarked Dodge Durango), who was following Sergeant Mike Ela's unmarked blue F-150 truck, had arrived in the back of the Complex and observed the collision.[6] Volkerson Aff. at ¶¶ 11, 14, Exh. 1.

The Denali then went forward to the north and began to make a turn around the corner to the west when it struck two parked cars on the north side. Schmeltzer Aff. at ¶ 9; Volkerson Aff. at ¶ 15; Ketchum Dep. at p. 43 l. 1 to p. 44 l. 11. On a diagram representing the parking lot area in front of Buildings 8 and 9 at the Complex and on which the legend indicates north is the top of the diagram, these two parked cars are the northern-most cars shown on the diagram. Volkerson Aff. at ¶ 15, Exh. 1. The Denali then backed up to a position where it was no longer in contact with the parked cars. Ketchum Dep. at p. 46 ll. 17-22.

   1.   *The Police Officers' Account of the Shooting Incident*

   At the time the Denali hit the parked cars, Deputy Volkerson was driving behind Sergeant Ela so that Sergeant Ela could put his vehicle directly in front of the Denali,

---

[6]      Deputy Volkerson and Sergeant Ela were driving to a position to perform a tactical park maneuver in an effort to prevent the Denali from escaping. Volkerson Aff. at ¶¶ 16-17. As part of the tactical park maneuver, the goal was to go bumper-to-bumper with the suspect vehicle so that the suspect would not be able to break free from the tactical park. *Id.* Deputy Volkerson had his vehicle behind Sergeant Ela's truck to provide extra weight because he was concerned that the weight of Sergeant Ela's truck would not be able to stop the Denali. *Id.*

with Deputy Volkerson behind Sergeant Ela.  Volkerson Aff. at ¶¶ 16-17.  Because there were cars parked to the right (passenger side) of the Denali, the officers perceived that Breedlove's most practical avenue of escape was to his left in the direction of Deputy Leone, Detective Gorberg, and Deputy Rafael Cruz.  Leone Aff. at ¶ 15; Gorberg Aff. at ¶ 15.  The officers saw the Denali move forward or push against Sergeant Ela's truck, saw the Denali's tires turned toward the left in the direction of officers on foot, and heard the Denali's engine revving.  Leone Aff. at ¶ 15; Schmeltzer Aff. at ¶ 12; Volkerson Aff. at ¶ 18;  Gorberg Aff. at ¶ 15.  Out of fear for the safety of themselves and their fellow deputies, some of the officers fired toward Breedlove in the first volley of shots.  Schmeltzer Aff. at ¶ 12; Gorberg Aff. at ¶ 16.

Following the first volley of shots, there was a pause.  Leone Aff. at ¶ 17; Schmeltzer Aff. at ¶ 13; Volkerson Aff. at ¶ 20;  Gorberg Aff. at ¶ 17.  The police saw Breedlove with at least one or both hands up.  Leone Aff. at ¶ 17; Schmeltzer Aff. at ¶ 13; Volkerson Aff. at ¶ 21;  Gorberg Aff. at ¶ 17.  The police said to Breedlove, "Police, put your hands up," and heard him say things like "my hands are up" or "they're up." Leone Aff. at ¶ 17; Schmeltzer Aff. at ¶ 13; Volkerson Aff. at ¶¶ 20-21;  Gorberg Aff. at ¶ 17.  However, officers then heard the Denali's engine revving, saw Breedlove put his hands down, noticed the Denali's wheels were turned to the left in the direction of the officers approaching to apprehend Breedlove, and saw the Denali strike Sergeant Ela's truck.  Leone Aff. at ¶¶ 17-18; Schmeltzer Aff. at ¶¶ 14-15;  Volkerson Aff. at ¶ 22;  Gorberg Aff. at ¶¶ 17-18.  The Denali pushed Sergeant Ela's truck back into Deputy Volkerson's Dodge Durango, which was parked behind Sergeant Ela.  Volkerson Aff. at

¶¶ 22, 24, Exh. 1.  Officers fired a second volley of shots toward Breedlove out of fear for the safety of themselves and their fellow deputies.  Leone Aff. at ¶¶ 18, 20; Schmeltzer Aff. at ¶¶ 16, 18; Volkerson Aff. at ¶¶ 23, 26;  Gorberg Aff. at ¶¶ 18, 20. After the second volley of gunfire, there was no more movement inside the Denali. Gorberg Aff. at ¶ 19.  Breedlove died due to multiple gunshot wounds.  First Am. Compl. ¶ 12.

Sergeant Davis arrived at the scene of the shooting (from his post outside the complex) within two minutes of the second volley.  Davis Dep. at p. 38 ll. 3-19. Davis has testified that two aerial photographs of the scene accurately represented the scene as he saw it when he arrived immediately after the shooting incident.[7]  Davis Dep. at p. 32 ll.2-13 and Composite Exh. 4.

### 2. *Ms. Baker's Account of the Shooting Incident*

Ms. Baker, who lived in Building 9 of the Complex at the time, testified that she first saw Breedlove's vehicle in the northeast corner of the parking lot area between Building 8 and 9 with its tail lights on.[8]  Baker Dep. at p. 25 l. 18 to p. 26 l. 8, p. 34 ll. 12-14, p. 35 ll. 11-24.  She did not see the Denali back out, but saw it swerve like he had just pulled out.  *Id.* at p. 43 l. 1 to p. 44 l. 3.  She observed a blue pickup truck go straight up to the Denali's front bumper and push it backwards and saw a number of other cars block the Denali's path.  *Id.* at p. 36 l. 1 to p. 42 l. 22.  Ms. Baker believed Breedlove was being carjacked or robbed, and alleges that the people approaching Breedlove's Denali were

---

[7]    Copies of these aerial photographs are attached as **Exhibit G**.

[8]    The testimony of Ms. Baker, an alleged eyewitness, is accepted as true solely for the purposes of this Motion.

wearing black or military camouflage, masks, and were not wearing police vests. *Id.* at p. 49 ll. 8-13, p. 54 l. 17 to p. 56 l. 22, p. 88 ll. 8-12. Ms. Baker alleges that the camouflaged men began shooting at Breedlove. *Id.* at 56 l. 23 to p. 57 l. 13.

Ms. Baker confirms there was a pause in the shooting, and at that time, Ms. Baker saw Breedlove with his hands up. *Id.* at p. 58 ll. 19-22, p. 61 ll. 17-25, p. 62 ll. 11-24, p. 63 ll. 8-20, p. 65 ll. 13-23. However, Ms. Baker admits she could not hear what Breedlove said to police at that time because she was engaged in a shouting match with the police officers she believed to be carjackers. *Id.* at p. 63 l. 21 to p. 65 l. 10, p. 65 l. 24 to p. 66 l. 14, p. 77 ll. 16-21. She also admits that her focus was no longer on Breedlove, but rather on herself, because she alleges the camouflaged men began shooting at her as well. *Id.* at p. 77. ll. 16-25. She went up the back up the stairs to her apartment in the back of the building, which has no windows facing the parking lot. *Id.* at p. 69 ll. 16-22, p. 78 ll. 1-9, p. 78 l. 19 to p. 79 l. 2. Sometime later, she went out to the breezeway on her floor facing the parking lot because she needed medical attention due to a broken nose, toe, knee and fractured arm, which she allegedly sustained in a fall up the stairs attempting to flee the gunshots fired at her. *Id.* at p. 80 l. 17 to p. 82 l. 25. Ms. Baker alleges it was at daybreak, well after the shooting incident,[9] that she saw the men putting police vests on. *Id.* at p. 79 ll. 3-6, p. 81 ll. 8-9, p. 83 l. 16 to p. 84 l. 6. She also claims that the men never took their masks off – not even when the Florida Department of Law

---

[9]      Sunrise on January 5, 2010 in Orlando, Florida occurred at 7:19 a.m., according to the Astronomical Applications Department of the U.S. Naval Observatory, of which this Court can take judicial notice. **Exhibit H**; *U.S. v. Bervaldi*, 226 F.3d 1256, 1266 n.9 (11th Cir. 2000).

Enforcement ("FDLE") truck arrived to investigate the shooting.  *Id.* at p. 88 l. 13 to p. 89 l. 4.

### C.  Stolen Property in Breedlove's Possession

An Apple iPod Touch, with the name "Chris McLarnon" and a telephone number etched in the metal, was found in the Denali.  Affidavit of Deputy Timothy Nazarro ("Nazarro Aff."), attached as **Exhibit I**, at ¶ 5.  Deputy Timothy Nazarro of the OCSO called and spoke with Mr. McLarnon.  *Id.* at ¶ 6.  Following their conversation and based on Deputy Nazarro's investigation, Deputy Nazarro determined that Mr. McLarnon reported to the Seminole County Sheriff's Office that his vehicle was burglarized and that items were stolen from his vehicle (including his iPod Touch) between 11:00 p.m. on January 3, 2010 and 11:00 a.m. on January 4, 2010.  *Id.* at ¶¶ 7-8; *see also* **Exhibit J** (certified copy of Seminole County Sheriff's Office Offense Report and Chris McLarnon's victim statement).

### D.    Breedlove's Criminal History

At the time of his death, Breedlove had been convicted two or more times of theft, including multiple counts of grand theft for which he was arrested on April 13, 2008 by the Orlando Police Department on an out of county warrant.  **Exhibit K** (certified copy of FDLE criminal history report on Breedlove) at pp. 13-17; **Exhibit L** (certified copy of Leon County Sheriff's Office probable cause affidavit for the multiple counts of grand theft committed on January 23-24, 2008 and underlying the April 13, 2008 arrest).

## III. ARGUMENT[10]

**A. Hartford is Entitled to Summary Judgment Because Plaintiffs Cannot Prove Breedlove's Death Resulted from "Injury" as Defined by the Policy.**

The Policy pays accidental death benefits when an insured person suffers an "Injury" that results in a loss (death or dismemberment).  **Exhibit A** at p. 4.  "Injury" is defined as "bodily injury resulting directly from accident and independently of all other causes."  The Policy does not define "accident" and therefore Florida courts give the term "accident" its "man-on-the-street" definition.  *Buck v. Gulf Life Ins. Co.*, 548 So.2d 715, 718 (Fla. 4th DCA 1989); *Roberson v. United Servs. Auto. Ass'n*, 330 So.2d 745, 746 (Fla. 1st DCA 1976) (an accident is customarily defined as an unexpected or unusual event, something that happens by chance and without design, an event from an unknown cause).  Whether a result is accidental is examined from the insured's point of view.  *See, e.g., Government Employees Ins. Co. v. Novak*, 453 So.2d 1116, 1118 (Fla. 1984); *Allstate Ins. Co. v. Cruse*, 734 F. Supp. 1574, 1578 (M.D. Fla. 1989).

Under Florida law, the insured bears the burden of proving that a claim against it is covered by the insuring clause of the insurance policy at issue.  *Mid-Continent Cas. Co. v. Frank Casserino Const., Inc.*, 721 F.Supp.2d 1209, 1214 -1215 (M.D. Fla. 2010); *New York Life Ins. Co. v. Coll*, 568 So.2d 1306, 1307 (Fla. 3d DCA 1990). Accordingly,

---

[10]  The purpose of summary judgment is to dispose of unsupported claims or defenses which, as a matter of law, do not raise issues of material fact suitable for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); Fed.R.Civ.P. 56(a).  Once the moving party has met its burden of demonstrating that there is no genuine issue of material fact that should be decided at trial, the burden shifts to the non-moving party to "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 584 (1986).

plaintiffs bear the burden to establish that Breedlove's death by gunshot resulted directly from accident and independently of all other causes.  Plaintiffs cannot meet their burden under the circumstances of this case.

>    1.  *Breedlove's Death Was Not Accidental Because It Was Foreseeable*

Although the Florida Supreme Court recognizes that the doctrine of foreseeability is generally inappropriate to use in construing accident policies, *Gulf Life Ins. Co. v. Nash*, 97 So. 2d 4, 9 (Fla. 1957), there is an exception to the rule when the insured acts as an aggressor in the situation that gives rise to the insured's death.  *See, e.g., J.C. Penney Life Ins. Co. v. Moser*, 490 So.2d 1275, 1277 (Fla. 5th DCA 1986) (stating that the court "is not persuaded . . . that the Supreme Court [in *Nash*] has rejected the foreseeability doctrine in *all* accidental death or injury cases."); *see also Brown v. State Farm Mut. Auto. Ins. Co.*, 302 So.2d 445, 447 (Fla. 1st DCA 1974) (determining that the court is "not persuaded . . .  that the Supreme Court [in *Nash*] rejected the foreseeability doctrine in all accidental death or injury cases."); *Conn. Gen. Life Ins. Co. v. Breslin*, 332 F.2d 928, 934 (5th Cir. 1964) (finding that "[t]he *Nash* case, critical as it was of the foreseeability rule, was not a case in which there had been any altercation and we are unwilling to assume it would be applied in such a case.").

For example, in *Moser*, the court held that an insured "who shoots at an armed police officer must know and certainly should expect that the officer will shoot back to defend himself . . . so it cannot be said that the result occurred by chance . . . or that it was an unforeseen" happening.  *Moser*, 490 So.2d at 1278.  *See also Brown*, 302 So.2d at 447 (summary judgment for insurer on accidental death policy where brother-in-law of

decedent shot decedent in self-defense).  Similarly here, the undisputed facts establish that Breedlove appeared to surrender to men who identified themselves as police after the first volley of shots fired, but then hit the accelerator of his vehicle as the police approached to apprehend him.  At the time, the front wheels of his vehicle were turned in the direction of the men on foot near the front driver side of his vehicle.  Breedlove's actions were tantamount to the aggressive acts at issue in *Moser* and *Brown*, and therefore, Breedlove should have foreseen that his acts could result in his injury or even death.

Plaintiffs will ostensibly point to Ms. Baker's testimony to refute the notion that Breedlove knew the individuals approaching his vehicle prior to the first volley of shots were police.  However, as noted above, Ms. Baker admits that she did not know what, if anything, Breedlove said during the pause in shooting.  Therefore, Ms. Baker simply cannot refute the police officers' consistent accounts that Breedlove recognized the men as police officers, feigned surrender, and then attempted to accelerate his vehicle toward the individuals approaching on foot to extract him.

More importantly, whether Breedlove actually believed the men approaching his vehicle were law enforcement or not, Breedlove knew they had loaded guns because of the prior volley of shots.  Breedlove knew or should have known that his attempt to accelerate the Denali toward the men approaching his vehicle on foot might result in another volley of shots resulting in his injury or death.  *See Brown*, 302 So.2d at 447 (decedent shot by brother-in-law in self-defense after decedent pointed loaded gun at brother-in-law while making threatening statements; decedent's death was foreseeable

and not an accident); *see also Ritchie v. John Hancock Mut. Life Ins. Co.*, 521 S.W. 2d 367 (Tex. App. 1975) (claimant injured when, after breaking into a truck, another individual warned him "get out in the open, I have a gun" but claimant fled and was shot; because injuries were foreseeable, they were not accidental); *Walker v. Metro. Life Ins. Co.*, 272 F. Supp. 217 (S.D. W. Va. 1967) (decedent was prowling around his ex-wife's house, made threatening phone call, and, despite her warning that she would get a gun if he did not leave, decedent began to cut through her window screen; ex-wife's shooting of decedent was foreseeable and his death was not accidental).   The result of Breedlove's aggressive actions was foreseeable, and therefore, Breedlove's death did not result from an accident and independently of all other causes. For these reasons, Breedlove's death does not constitute an "Injury" as defined under the Policy.

> 2. *Breedlove's Death Was Not Accidental Because His Encounter With Police*
> *Was Not Fortuitous or "By Chance"*

To establish that an accident occurred, plaintiffs must prove that Breedlove's encounter with police was unusual or "by chance, without design, an event from an unknown cause." *Roberson*, 330 So.2d at 746; *see also Nash*, 97 So. 2d at 9 ("[T]he average person buying accident insurance policies assumes that he is covered for any fortuitous and undesigned injury.").   However, Breedlove placed himself into a situation where an encounter with either the police or dangerous individuals was not unusual or "by chance" and continued to make decisions that placed him in danger of injury. Breedlove had just exited a stolen vehicle[11] and got into his own vehicle.  He was ordered

---

[11]     Breedlove is presumed to know it was stolen due to the punched ignition.  *See* § 812.022(6), Fla. Stat., discussed *infra* at p. 23.

by two police officers to stop and get out, but instead of complying, Breedlove floored his vehicle in reverse, hit Deputy Schmeltzer's Ford Explorer behind him, drove forward, turned a corner in the parking lot and hit two parked cars.[12]   Breedlove backed up so he was no longer in contact with the parked cars, and the front of his Denali came into contact with the blue Ford F-150 truck.  He was yelled at by several men,[13] and was fired upon.   After the first volley of shots, Ms. Baker cannot dispute that the men verbally identified themselves as police, that Breedlove indicated surrender with his hands up and saying something to the effect of "my hands are up," that Breedlove again hit his accelerator while the front tires of his Denali were pointed toward the persons approaching him on foot, and that Breedlove was then shot and died from multiple gunshot wounds.

On these facts, Breedlove's injuries were not "by chance and without design, an event from an unknown cause."   Breedlove had placed himself in a dangerous situation through the theft of the stolen truck and his actions in response to the police instructions and requests.   For these reasons, his injuries were not the result of an accident and certainly not "independent of all other causes."   For these reasons, Breedlove's death does not constitute an "Injury" as defined under the Policy.

---

[12]      Ms. Baker's testimony does not refute the officers' account of this first contact with Breedlove that night.  As noted above, Ms. Baker did not witness anything prior to Breedlove backing his Denali up after hitting the two parked cars during his initial escape attempt.

[13]      From this point on, the testimony of Ms. Baker is that the men who approached Breedlove's car were not wearing attire identifying them as police.  Thus, for events occurring after Ms. Baker first witnessed Breedlove's car, Hartford refers to these individuals only as men and not police.

**B. Hartford is Entitled to Summary Judgment Because Breedlove's Death Occurred During the Commission of One or More Felonies**

If, as Hartford contends, Breedlove's death does not constitute an "Injury" as defined under the Policy, the Court need not reach the issue of whether any Policy exclusions apply to preclude coverage in this case.  However, if the Court determines that there are genuine issues of material fact as to the accidental nature of Breedlove's death, no benefits are payable under the Policy because the felony exclusion operates to bar coverage.  The felony exclusion precludes coverage for any Loss (death) resulting from Injury sustained while committing or attempting[14] to commit a felony.

Hartford bears the burden to establish the applicability of a policy exclusion. *Mid-Continent Cas. Co.*, 721 F.Supp.2d at 1214 -1215.  In this regard, Hartford need only show that Breedlove's death occurred while he was committing or attempting to commit a felony by a preponderance of the evidence.  *See* 17A Couch on Ins. § 254:43; *Cager v. Southern Life & Health Ins. Co.*, 344 So.2d 1166, 1167 (La. Ct. App. 1977); *cf. Carter v. Carter*, 88 So.2d 153, 158 (Fla. 1956).  Moreover, "as a general rule, one need not be convicted of a felony for one's estate or beneficiaries to be denied the proceeds of an insurance policy by virtue of a policy clause in which the insurer excludes the risk of death resulting from the insured's commission of a felony." *Williams v. New England Mut. Life Ins. Co.,* 419 So.2d 766, 771 (Fla. 1st DCA 1982).  In this case, the Court has many felonies from which to choose.

---

[14]      The offense of criminal attempt is defined under Florida law as attempting "to commit an offense prohibited by law and in such attempt does any act toward the commission of such offense but fails in the perpetration or is intercepted or prevented in the execution thereof."  § 777.04(1), Fla. Stat.

1.     *Felonies Before Ms. Baker First Observed the Scene*

Ms. Baker's alleged eyewitness account begins when Breedlove's vehicle was in the northeast corner of the parking lot, immediately before it went nose to nose with the blue truck.  Prior to that time, Breedlove committed at least two felonies – Aggravated Assault, §§ 784.011 & 784.021, Fla. Stat. and Fleeing/Eluding the Police, § 316.1935(1), Fla. Stat.

The undisputed account of events before Ms. Baker happened upon the scene is that that two officers – both wearing tactical vests identifying them with the word "SHERIFF" in white lettering on black – confronted Breedlove when he first got into the parked Denali. Detective Gorberg was at the driver's side window of the Denali, and Deputy Leone was standing on a raised parking island in front of the Denali.  Deputy Leone made eye contact with Breedlove, and both shouted "Police, hands up" or "Get your hands up" at Breedlove.  Rather than comply with police demands and surrender, Breedlove floored the Denali in reverse at 100% throttle, while Detective Gorberg was standing near his driver's side window in close proximity to the vehicle.  Detective Gorberg stated that Breedlove's sudden reversal made him fear that he would be struck by the Denali.

a.     Aggravated Assault, §§ 784.011 &  784.021, Fla. Stat.

Assault is "an intentional, unlawful threat by word or act to do violence to the person of another, coupled with an apparent ability to do so, and doing some act which

creates a well-founded fear in such other person that such violence is imminent."   §

784.011, Fla. Stat.  Aggravated assault is a felony,[15] and is "an assault:

> (a) With a deadly weapon without intent to kill; or

> (b) With an intent to commit a felony."

§ 784.021, Fla. Stat.

A car can be a "deadly weapon" for the purposes of the felony of aggravated assault. *Solitro v. State*, 165 So.2d 223 (Fla. 2d DCA 1964).  Breedlove's intentional, unlawful threatening act was flooring his Denali in reverse with Detective Gorberg in close proximity to the Denali near his driver's side window.  *See Cambell v. State*, 37 So.3d 948, 950 (Fla. 5th DCA 2010) (assault statute does not "require as an element of the crime that the accused had to intend to do physical harm to the victim. The only intent inherent in the statutes is the intention to make a threat to do violence.").  Further, Breedlove's act created fear in Detective Gorberg that he could be hit by the Denali. Thus, the undisputed facts establish that Breedlove committed the felony of aggravated assault on Detective Gorberg.

> b.    Fleeing/Eluding the Police, § 316.1935(1), Fla. Stat.

Further, Breedlove was killed while committing the felony of fleeing/eluding the police.  Section 316.1935(1), Fla. Stat., provides:

> (1) It is unlawful for the operator of any vehicle, having knowledge that he or she has been ordered to stop such vehicle by a duly authorized law enforcement officer, willfully to refuse or fail to stop the vehicle in compliance with such order or, having stopped in knowing compliance with

---

[15]    The charge is enhanced if the aggravated assault is on a law enforcement officer. § 784.07, Fla. Stat.

> such order, willfully to flee in an attempt to elude the officer, and a person
> who violates this subsection commits a felony of the third degree ….

Here, it is undisputed that the two officers approached Breedlove in his Denali and ordered him to stop, at which point Breedlove reversed his Denali at full acceleration, hit Deputy Schmeltzer's vehicle, and then drove forward around the corner of the parking lot at which point he encountered the men who shot him.  In other words, Breedlove was still in the process of fleeing the first two officers when he was killed.

> 2.      *Felonies Before The Second Volley of Shots*

Following Breedlove's feigned "surrender" to men who had verbally identified themselves as police (before the second volley of shots), Breedlove engaged in at least three other felonies, by hitting his accelerator with his wheels turned in the direction of the police, including Aggravated Assault, §§ 784.011 & 784.021, Fla. Stat.,  Resisting an Officer with Violence, § 843.01, Fla. Stat., and Fleeing/Eluding the Police, § 316.1935(1), Fla. Stat.[16]

> a.      Aggravated Assault, § 784.021, Fla. Stat.

Breedlove's intentional, unlawful threatening act was hitting the accelerator with his wheels turned in the direction of the police, which caused several of the deputies to fear for their own safety and thus constituted aggravated assault.  §§ 784.011 & 784.021, Fla. Stat.

---

[16]      Again, the account given by Ms. Baker does not refute the events described by police during this time period because she admittedly was not focused on Breedlove at the time and could not hear what he said.

b.      Resisting an Officer with Violence, § 843.01, Fla. Stat.

Similarly, Breedlove was resisting an officer with violence.  Section 843.01, Fla.

Stat., provides:

> Whoever knowingly and willfully resists, obstructs, or opposes any officer as
> defined in s. 943.10(1)[17] … by offering or doing violence to the person of
> such officer or legally authorized person, is guilty of a felony of the third
> degree ….

Resisting an officer with violence is not a specific intent crime requiring an intent to

do harm, but rather only requires a general intent to "knowingly and willfully"

impede an officer in the performance of his or her duties.  *Frey v. State*, 708 So.2d

918, 920 (Fla. 1998).  By hitting the accelerator with his wheels turned in the

direction of police, Breedlove was offering to do violence to these officers and

therefore committing the felony of resisting an officer with violence (or at least

attempting to do so).

c.      Fleeing/Eluding the Police, § 316.1935(1), Fla. Stat.

Finally, Breedlove willfully refused to stop or failed to stop the Denali in

compliance with the orders of the police when he hit the accelerator of the Denali and

the Denali struck Sergeant Ela's truck.  As a result, he was committing the felony of

fleeing/eluding the police (or at least attempting to do so).  § 316.1935(1), Fla. Stat.

---

[17]      Section 943.10(1) defines a law enforcement officer in pertinent part as "any
person who is elected, appointed, or employed full time by any municipality or the state
or any political subdivision thereof; who is vested with authority to bear arms and make
arrests; and whose primary responsibility is the prevention and detection of crime or the
enforcement of the penal, criminal, traffic, or highway laws of the state."

3.      *Felonies Irrespective of Police Involvement*

Even without reference to police activity, Breedlove was committing at least two felonies at the time he was killed:  (a) grand theft of the stolen truck; and (b) theft of the one recently stolen iPod found in the Denali, petit theft which rises to the level of a felony because Breedlove had been convicted of theft at least twice before.

For the crime of theft, Florida Statutes provide that:

A person commits theft if he or she knowingly obtains or uses, or endeavors to obtain or use, the property of another with intent to, either temporarily or permanently:

(a) Deprive the other of a right to the property or the benefit from the property.
(b) Appropriate the property to his or her own use or to the use of a person not entitled to the use of the property.

§ 812.014(1), Fla. Stat.  "Obtains or uses" means "any manner of (a) taking or exercising control over property; (b) making any unauthorized use, disposition, or transfer of property."  § 812.012(3), Fla. Stat.

Even if Breedlove did not originally steal the stolen truck, there is an inference he knew it was stolen because it was in his possession and had a bypassed ignition.  § 812.022(6), Fla. Stat. ("Proof that a person was in possession of a stolen motor vehicle and that the ignition mechanism of the motor vehicle had been bypassed …, unless satisfactorily explained, gives rise to an inference that the person in possession of the stolen motor vehicle knew or should have known that the motor vehicle had been stolen.").  Thus, Breedlove was continuing to commit the felony of grand theft auto, § 812.014(2)(c), Fla. Stat., by making unauthorized disposition of the stolen truck – leaving it at the Alta Westgate complex and thereby intending to deprive its owner of its use.

Further, at the time Breedlove was killed, he was exercising control over stolen property – one iPod, stolen less than 48 hours before, found in his Denali – and thereby intending to deprive its owner of its use.  Again, there is an inference that he knew it was stolen.  § 812.022(2), Fla. Stat. ("Proof of possession of property recently stolen, unless satisfactorily explained, gives rise to an inference that the person in possession of the property knew or should have known that the property had been stolen.").  This qualifies as petit theft (theft of anything less than $300 in value, *see* § 812.014(2)(e)-(3)(a), Fla. Stat.), but is a felony for a person (like Breedlove) previously convicted of theft two or more times. § 812.014(3)(c), Fla. Stat. ("A person who commits petit theft and who has previously been convicted two or more times of any theft commits a felony of the third degree.").

## IV.    CONCLUSION

For these reasons, Hartford respectfully submits it is entitled to judgment as a matter of law on the entirety of Plaintiffs' claims.  Breedlove's death does not constitute an "Injury" as defined under the Policy, and even if it did, the Policy's felony exclusion bars recovery because Breedlove committed or attempted to commit multiple felonies at the time of his death.

Respectfully submitted this 1st day of June, 2012.

s/ Jeannine Jacobson
JEANNINE C. JACOBSON
Florida Bar No. 058777
E-mail:  jeannine.jacobson@sedgwicklaw.com
Sedgwick LLP
2400 East Commercial Boulevard, Suite 1100
Fort Lauderdale, FL  33308

Telephone: (954) 958-2500
Facsimile: (954) 958-2513
Attorneys for Defendant Hartford Life and
 Accident Insurance Company

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** service of a true copy of this document on this <u>1st</u> day of

June, 2012, by electronic filing and the CM/ECF system, which will send notice to the

attorneys listed on the attached service list.

<u>s/ Jeannine Jacobson</u>
JEANNINE C. JACOBSON

**SERVICE LIST**
**Breedlove v. Hartford Life & Accident Ins. Co.**
**Case No. 6:11-CV-991-ORL-28-GJK**
**United States District Court, Middle District of Florida**

| | |
|---|---|
| Angelique Jackson, Esq.<br>aaj@leverslaw.com<br>The Levers & Jackson Law Firm<br>2930 Okeechobee Blvd.<br>Suite 210<br>West Palm Beach, FL 33409<br>(561) 721-6200 (p)<br>(561) 721-6202 (f)<br>Attorneys for Plaintiffs | |