IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

TIFFANYE BREEDLOVE as personal representative of the estate of Torey Breedlove, deceased, TAMESHA PRINCE on behalf of T.B.1, SHARELLE TYSON on behalf of T.B.2, and TERESA JONES on behalf of T.B.3 and T.B.4,

Case No.: 6:11-CV-991-ORL-28-GJK

Plaintiffs,

v.

HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY,

Defendant.

______________________________/

## AFFIDAVIT OF PAUL VOLKERSON

STATE OF FLORIDA
COUNTY OF ORANGE

BEFORE ME, the undersigned Notary Public, this date personally appeared PAUL VOLKERSON, who after being first duly sworn upon oath, deposes and says as follows:

1. I am over 21 years of age and competent to make this Declaration.
2. I am currently a duly appointed Orange County deputy sheriff assigned to the Investigative Support Squad (formerly known as the Auto TRAP Unit) and held the same position on January 5, 2010. I am familiar with the events on January 5, 2010 leading up to the death of Torey Breedlove. The facts set forth in this Affidavit are based on my own personal knowledge.

EXHIBIT
D

3. At approximately 1:58 a.m. on January 5, 2010, I received a page from a surveillance device on a stolen Dodge Ram truck ("stolen truck") indicating that the stolen truck was on the move.

4. The stolen truck had been parked at the Alta Westgate apartment complex in Orlando, Florida at the time the tracking device alerted me to its movement.

5. Prior to installing the tracking device, the stolen truck had been identified as stolen by the vehicle identification number, but it also had the license plate of another vehicle which had not been reported stolen.

6. Mr. Breedlove was suspected of having stolen the Dodge Ram truck and was suspected of an earlier crime in November 2009 involving the theft of another Dodge Ram ("the November 2009 crime") which was being investigated by the Auto Theft Unit. I notified other members of my Unit that the stolen truck was on the move.

7. Switching the license plate on a stolen vehicle with one from another vehicle which had not been reported stolen was a common practice of felony criminal suspects and was consistent with the modus operandi of the individuals who committed the November 2009 crime.

8. At some time after 1:58 a.m. on January 5, 2010, I responded to the location of the stolen truck, as indicated on the tracking device, in order to conduct surveillance on the stolen truck. At that time, the stolen truck was on I-4 traveling east into Seminole County, and I followed it.

9. Through electronic surveillance and visual surveillance between the hours of approximately 2:00 a.m. and 5:00 a.m. on January 5, 2010, I observed the stolen

truck drive in and out of several apartment complexes in Seminole County, after which point the stolen truck returned to Orange County and continued to drive in and out of several apartment complexes. The stolen truck would stay in these complexes for 10-20 minutes at a time, but I did not follow it into any of these complexes so as not to alert the suspect that he was being surveilled by law enforcement, and thereby avoid apprehension.

10. This manner of driving in and out of several apartment complexes during early morning hours in a stolen vehicle was consistent with the modus operandi of the individuals who committed the November 2009 crime.

11. When the stolen truck returned to the Alta Westgate apartment complex (the "Complex"), I remained outside the Complex until I heard a command to move in.

12. At that point, I followed Sergeant Ela's vehicle, an unmarked blue Ford F-150 truck, in my unmarked vehicle, a metallic Dodge Durango, into the Complex.

13. When I arrived at the back of the Complex near buildings 8 and 9, I saw Mr. Breedlove's personal vehicle, a GMC Yukon Denali (the "Denali"), collide with Detective Schmeltzer's silver Ford Explorer.

14. On the attached diagram (**Exhibit 1**), which represents the parking lot area in front of buildings 8 and 9 at the Complex and has my signature at the bottom, I wrote "1st observ [sic] Breedlove strike car" to indicate where I was when I first observed the Denali collide with Detective Schmeltzer's car. On the diagram which is **Exhibit 1**, I drew a line from where I wrote "1st observ [sic] Breedlove strike car" to indicate

my path of travel as I continued in a northerly direction until I turned east around the corner in the parking lot.

15. After colliding with Detective Schmeltzer's car, the Denali then headed north and began to make a turn around the corner to the west when it appeared to me to strike two parked cars on the north side. These two parked cars, the northern-most cars shown on the diagram which is **Exhibit 1**, are at the top of the diagram.

16. As the Denali struck the two parked cars, Sergeant Ela and I drove to a position where Sergeant Ela's truck was directly in front of the Denali and my vehicle was directly behind Sergeant Ela's truck.

17. This positioning was a tactical park maneuver in an effort to prevent the Denali from escaping. As part of the tactical park maneuver, the goal was to go bumper-to-bumper with the suspect vehicle so that the suspect would not be able to break free from the tactical park. I positioned my vehicle directly behind Sergeant Ela's truck to provide extra weight, because I was concerned that the weight of Sergeant Ela's truck would not be able to stop the Denali.

18. I observed the Denali moving forward toward Sergeant Ela's truck, and at this time there were other Orange County deputy sheriffs on foot near the driver's side of the Denali and the passenger side of Sergeant Ela's truck.

19. At that time, shots were fired (the "first volley"). I did not fire my weapon during the first volley.

20. There was a pause after the first volley, and I exited my vehicle and went to the driver's side door of Sergeant Ela's vehicle. I began to give verbal commands to

the suspect, stating "Police, hands up" over and over again. I heard other deputies giving similar commands for the suspect to put his hands up.

21. At this point, I observed Mr. Breedlove with his hands up and heard him say "my hands are up." From what I observed, I initially had the impression that Mr. Breedlove was surrendering at that time. I observed other deputies approaching the Denali to apprehend Mr. Breedlove. We continued to give commands for Mr. Breedlove to keep his hands up.

22. I then saw Mr. Breedlove unexpectedly put his hands down, and heard the Denali's engine begin revving. The Denali lunged forward and pushed Sergeant Ela's truck such that Sergeant Ela's truck backed into my vehicle.

23. At that point, out of fear that Breedlove's Denali could break free and hit and injure or kill me or other deputies on foot, I began firing my weapon (the "second volley").

24. My vehicle is the car shown on the left side of the diagram which is **Exhibit 1**, which is the western-most car shown on the diagram.

25. After the second volley ended, no further shots were fired.

26. When I fired my firearm, I was in fear for my life and the lives of other deputies. It was my belief when I fired that Mr. Breedlove intended to seriously injure or kill me and other deputies on the scene, and it was my belief when I fired that I was protecting my life and the lives of other deputies who were in close enough proximity to Mr. Breedlove's Denali to be seriously injured or killed.

FURTHER AFFIANT SAYETH NOT.

Paul V[signature]
PAUL VOLKERSON

THE FOREGOING instrument was sworn to and subscribed before me this _______ day of May, 2012, by PAUL VOLKERSON who is personally known to me (__) or who provided _______________________________________________ ___________ as proper identification.

Darla D. Jenkins
Notary Public

Darla D. Jenkins
(Print)

My Commission Expires:

NOTARY PUBLIC STATE OF FLORIDA
DARLA D. JENKINS
MY COMMISSION # DD 944350
EXPIRES: December 6, 2013
Bonded Thru Budget Notary Services




00000129

EXHIBIT
1