IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

TIFFANYE BREEDLOVE as personal representative of the estate of Torey Breedlove, deceased, TAMESHA PRINCE on behalf of T.B.1, SHARELLE TYSON on behalf of T.B.2, and TERESA JONES on behalf of T.B.3 and T.B.4,

Case No.: 6:11-CV-991-ORL-28-GJK

Plaintiffs,

v.

HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY,

Defendant.

______________________________/

**AFFIDAVIT OF JASON GORBERG**

STATE OF FLORIDA
COUNTY OF ORANGE

BEFORE ME, the undersigned Notary Public, this date personally appeared JASON GORBERG, who after being first duly sworn upon oath, deposes and says as follows:

1. I am over 21 years of age and competent to make this Declaration.
2. I am currently a duly appointed Orange County deputy sheriff and have held that position since 2006. I am currently assigned to the Auto Theft Unit and have held that position since 2009. I am familiar with the events on January 5, 2010 leading up to the death of Torey Breedlove, as well as an investigation of Mr. Breedlove in the fall of 2009. The facts set forth in this Affidavit are based on my own personal knowledge.

EXHIBIT
tabbies
F

3. In the fall of 2009, my Unit was conducting an investigation in which Mr. Breedlove was a suspect. One evening in November 2009, I and other deputies in my Unit attempted to apprehend two suspects in a stolen vehicle. At some point the suspects exited the stolen vehicle and fled on foot. We were able to apprehend one suspect (Demetric Carter), and the other suspect fled on foot. I interviewed Mr. Carter after he was apprehended, and he identified Mr. Breedlove as the other suspect who had fled on foot.

4. At approximately 2:00 a.m. on January 5, 2010, I was called to respond to the Alta Westgate apartment complex (the "Complex") in Orlando, Florida, in connection with a stolen vehicle investigation.

5. Upon arrival, I parked my car within sight of Mr. Breedlove's personal vehicle, a GMC Yukon Denali (the "Denali"). I was awaiting the return of a stolen Dodge Ram truck (the "stolen truck") which had been under surveillance by various other Orange County deputy sheriffs. I was wearing my Orange County Sheriff's tactical vest which is black with the word "SHERIFF" written in white letters on the front and back, and a star on the front.

6. Mr. Breedlove was suspected of stealing the Dodge Ram truck as well as the earlier crime in November 2009. I was part of the team whose responsibility it was to effect an arrest of Mr. Breedlove.

7. I observed Mr. Breedlove driving the stolen truck and saw him park it. I observed Mr. Breedlove get out of the driver's side of the stolen truck and saw him open the back gate of the stolen truck. I was able to recognize Mr. Breedlove based on having seen him before and having seen photographs of him before the night of January 5, 2010.

8. When I heard the command to move in, I backed my vehicle into a position behind the stolen truck to block it in.

9. Deputy John Leone and I both began approaching the Denali on foot. Deputy Leone was approaching the front of the Denali from a raised parking island directly in front of the Denali's parking spot. Deputy Leone was also wearing his tactical vest. I observed Deputy Leone give commands to Mr. Breedlove.

10. I approached the driver's side window of the Denali with my firearm drawn and gave commands to Mr. Breedlove to the effect of "Get your hands up. Show me your hands."

11. From my position, I observed one of Mr. Breedlove's hands drop out of sight. When this occurred, I was especially concerned, because based on my prior investigation of Mr. Breedlove, I was concerned that he might be reaching for a firearm. I had been told in November of 2009 by Demetric Carter that Mr. Breedlove always carried a gun with him. Mr. Breedlove then floored the Denali in reverse out of the parking spot.

12. At this point, I was in close proximity to the Denali near the driver's side window and without any cover. I also feared that I would be hit by the Denali when Mr. Breedlove floored it in reverse. I continued to yell commands for Mr. Breedlove to stop the vehicle, but he was non-compliant with these verbal commands.

13. Within seconds, Mr. Breedlove's Denali collided with Deputy Rick Schmeltzer's unmarked Ford Explorer and then drove to the northeast corner of the parking lot.

14. Shortly thereafter Mr. Breedlove's Denali was nose to nose with Sergeant Ela's unmarked blue F-150 truck, I took a position at the passenger side of Sergeant Ela's

truck. I could clearly see Mr. Breedlove who was in the Denali driver's seat. At that time, I was yelling "Get your hands up."

15. From my vantage point, I could see that the Denali was pushing against Sergeant Ela's truck and I could hear the Denali's engine racing. Cars were parked to the right of the Denali, and it appeared to me that Mr. Breedlove's most practical avenue of escape would have been in the direction of myself and other deputies.

16. At that time, I feared for my own safety and the safety of other deputies. I – along with other deputies – fired towards Mr. Breedlove (the "first volley").

17. After the first volley, there was a pause in the shooting to assess the situation and the threat level and to try and get Mr. Breedlove to comply and surrender. During this pause in fire, I heard other deputies give Mr. Breedlove verbal commands to the effect of "Show me your hands" and "Get your hands up." From my position, I could see that one of Mr. Breedlove's hands went up. I believed at that point that Mr. Breedlove was surrendering so I, along with other deputies, began approaching the Denali to apprehend Mr. Breedlove.

18. However, as we were approaching the Denali, I then heard the Denali's engine racing again and it struck Sergeant Ela's truck again. I could also see that the wheels of the Denali appeared to be turning in our direction. At this point, I, and the other deputies, were more out in the open with less cover. At that point, out of fear that Mr. Breedlove's Denali could break free and hit and seriously injure or kill me and other deputies, I began firing my weapon, and other deputies fired their weapons as well (the "second volley").

19. After the second volley ended, there was no more movement inside the Denali and no further shots were fired.

20. Each time I fired my firearm, I was in fear for my life and the lives of other deputies from Mr. Breedlove's vehicle. It was my belief when I fired that Mr. Breedlove intended to seriously injure or kill me and other deputies on the scene, and that he had the ability to do so. It was my belief when I fired that I was protecting my life and the lives of other deputies who were in close enough proximity to Mr. Breedlove's Denali to be seriously injured or killed.

FURTHER AFFIANT SAYETH NOT.

____________________________
JASON GORBERG

THE FOREGOING instrument was sworn to ~~and subscribed before~~ me this _______ day of May, 2012, by JASON GORBERG who is personally known to me (__) or who provided ________________________________________ ______ as proper identification.

____________________________
Notary Public

Darla D. Jenkins
(Print)

My Commission Expires:

NOTARY PUBLIC STATE OF FLORIDA
DARLA D. JENKINS
MY COMMISSION # DD 944350
EXPIRES: December 6, 2013
Bonded Thru Budget Notary Services