1

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
CASE NO.: 6:11-CV-991-ORL-28-GJK

TIFFANYE BREEDLOVE as personal
representative of the Estate of
Torey Breedlove, deceased, TAMESHA
PRINCE on behalf of T.B.1, SHARELLE
TYSON on behalf of T.B.2, and TERESA
JONES on behalf of T.B.3 and T.B.4,

       Plaintiffs,

v.

HARTFORD LIFE AND ACCIDENT INSURANCE
COMPANY,
       Defendant.
--------------------------------------/


DEPOSITION OF DEMETRIUS L. BAKER
Monday, April 30, 2012
2:14 p.m. - 4:17 p.m.


7628 Southwick Street
Orlando, Florida 32818



Reported By:
Tomeka Thompson
Notary Public, State of Florida
Esquire Deposition Solutions
Orlando Office  Job #289726
Phone - 407.426.7676
Fax   - 407.426.7878



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

2

1       APPEARANCES:

2           On Behalf of the Plaintiffs:

3           ANGELIQUE JACKSON, ESQUIRE
            ROGELL X. LEVERS, ESQUIRE

4           Levers & Jackson Law Firm
            Suite 210

5           2930 Okeechobee Boulevard
            West Palm Beach, Florida 33409

6

7

            On Behalf of the Defendant:

8

            JEANNINE C. JACOBSON, ESQUIRE

9           Sedgwick LLP
            Suite 1100

10          2400 East Commercial Boulevard
            Fort Lauderdale, Florida 33308-4044

11

12

            On Behalf of Demetrius L. Baker:

13

            NATALIE A. JACKSON, ESQUIRE

14          The Women's Trial Group
            133 West Robinson Street

15          Orlando, Florida 32801

16

17

18

19

20

21

22

23

24

25



3

                           I N D E X

TESTIMONY OF DEMETRIUS L. BAKER

      Direct Examination by Ms. Jacobson...................4

      Cross-Examination by Ms. Angelique Jackson..........95

      Redirect Examination by Ms. Jacobson................96

CERTIFICATE OF OATH.....................................98

CERTIFICATE OF REPORTER.................................99

ERRATA SHEET...........................................100

                          - - - -



                        E X H I B I T S

Defendant's Exhibit No. 17................................8
                   (Subpoena)


Defendant's Exhibit No. 18..............................26
                   (Site Plan)

Defendant's Exhibit No. 19..............................34
                   (Diagram)


Defendant's Exhibit No. 20..............................44
                   (Diagram)

Defendant's Exhibit No. 21..............................71
                   (Photograph)


Defendant's Exhibit No. 22..............................74
                   (Photograph)

Defendant's Exhibit No. 23..............................91
                   (Photograph)


                          - - - -



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

                                                                    4

 1              Deposition taken before Tomeka Thompson, Court

 2      Reporter and Notary Public in and for the State of Florida

 3      at Large, in the above cause.

 4                              - - - -

 5      Thereupon,

 6                      DEMETRIUS L. BAKER,

 7      having been first duly sworn or affirmed, was examined and

 8      testified as follows:

 9                      DIRECT EXAMINATION

10      BY MS. JACOBSON:

11         Q.   My name is Jeannine Jacobson and I'm here to take

12      your deposition, Ms. Baker.  And I know that Attorney

13      Jackson has a --

14              MS. NATALIE JACKSON:  Right.  Attorney Natalie

15              Jackson, I represent Ms. Demetrius Baker in another

16              case and I'm here just as her advisor.  And we also

17              have on the phone --

18              MS. ANGELIQUE JACKSON:  Attorney Angelique

19              Jackson.  I'm representing the Estate of Torey

20              Breedlove and his children.

21              MS. JACOBSON:  In this case?

22              MS. NATALIE JACKSON:  In this case, in the

23              current case.

24              MS. ANGELIQUE JACKSON:  In the current case, yes.

25              MS. JACOBSON:  Okay.  Can you hear me, Angelique?



5

1          MS. ANGELIQUE JACKSON:  Yes, I can hear you.

2          MS. JACOBSON:  Okay.

3     BY MS. JACOBSON:

4          Q.   Ms. Baker, I'm going to have you state your name

5     for the record.

6          A.   Demetrius Laquan Baker.

7          Q.   And what is your date of birth?

8          A.   10/19/63.

9          Q.   And if at any point the court reporter needs you

10    to speak up, I'm going to ask her to let you know.  And

11    I'm also going to ask her to let us know if she needs any

12    spelling clarifications or anything like that.  As I said,

13    my name is Jeannine Jacobson.  I represent an insurance

14    company in this case.  I'm here to ask you about the

15    incident on January 5, 2010.  And my role is representing

16    the insurance company to try to figure out what happened.

17          The court reporter, Tomeka, here is going to take

18    down my questions and so it's going to be important that

19    both of us speak clearly, so that she can take down the

20    answers.  So we want to say yes or no, but not uh-huh or

21    uh-uh, because it's difficult to tell what that means when

22    you're reading it on paper.  And as I said, I may have to

23    stop -- she may have to stop you from time to time for

24    spellings.  I may have to stop you from time to time if I

25    don't understand something you're saying.  So it's not me



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

6

1    trying to be rude.  It's just me trying to clarify.

2              And if you don't understand one of my questions,

3    I'd like you to let me know that, okay?

4         A.   Okay -- okay.

5         Q.   Okay.  And if at anytime you need to take a

6    break, will you let me know that as well?

7         A.   Yes.

8         Q.   Have you ever had anyone ask you questions before

9    in this format with a court reporter taking down your

10   testimony?

11        A.   Yes.

12        Q.   Okay.  Can you tell me when that happened?

13        A.   I'm not sure of the date, but I know it was FDLDA

14   (sic).  I think I'm saying it right, FDLD --

15             MS. NATALIE JACKSON:  FDLE, Florida Law --

16        Department of Law Enforcement.

17             MS. JACOBSON:  FDLE?

18             MS. NATALIE JACKSON:  Yes.

19   BY MS. JACOBSON:

20        Q.   Okay.  Other than giving any sort of statements

21   with regard to the January 5, 2010, incident, have you

22   ever had anyone take your statement in a circumstance like

23   this?

24        A.   My lawyer.

25        Q.   Okay.  Apart from any conversations with your



7

1      lawyer, anything else?

2           A.    No.

3           Q.    No.   Okay.   Have you ever testified at a trial?

4           A.    No.

5           Q.    And what did you do to prepare for today?

6           A.    I just went over my statement.

7           Q.    Okay.   I don't want to find out what you and

8      Natalie Jackson spoke about, because I don't want to find

9      out about that, but did you meet with Ms. Jackson in

10     preparation for today?

11          A.    Yes.

12          Q.    And did you look at any documents?

13          A.    No.

14          Q.    Did you listen to any of your prior statements or

15     watch any prior video statements?

16          A.    Just my statement.

17          Q.    Okay.   You listened to a statement?

18          A.    To my statement.

19          Q.    Okay.   And when you say your statement, is that a

20     statement that you gave to the FDLE or to someone else?

21          A.    To my lawyer.

22          Q.    Okay.   Was that the statement that you gave to

23     Chris Jackson of the Women's Trial Group?

24          A.    Yes.

25          Q.    Okay.   And was that a video statement?



8

1      A.   Yes.

2           MS. JACOBSON:  All right.  And then, I'm just

3      going to show you -- I think we're going to

4      sequentially number the exhibits and I believe we're

5      up to Exhibit 17.  So I'm going to give this one to

6      the court reporter.  That's 17.  This one is for you.

7      And, Natalie, I'll give one to you, on behalf of

8      Angelique.

9           MS. ANGELIQUE JACKSON:   Thank you.

10          (Defendant's Exhibit No. 17 was marked for

11     identification.)

12     BY MS. JACOBSON:

13     Q.   And so what I'm showing you is the subpoena for

14     your appearance here today, for your deposition here

15     today.  And right about in the middle of the page it asks

16     if you had -- it asks you to have any documents you might

17     have with you for the purpose of my asking you questions.

18     Do you have any documents that relate to the incident on

19     January 5, 2010?

20     A.   No, I don't.

21     Q.   Okay.  You don't have any notes or pictures or

22     anything like that?

23     A.   Right here (pointing).

24     Q.   It's in your head, is what you're gesturing?

25     A.   (Witness nods head.)



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Demetrius L. Baker                                          April 30, 2012

9

1      Q.   Okay.  And I understand when we served you with

2    the subpoena, that we've marked as Exhibit 17, I

3    understand you were in the hospital at that time?

4      A.   Um-hum -- I wasn't -- no, I was at -- you know, I

5    was in the emergency room.

6      Q.   Okay -- okay.  And was that for the injury you

7    have with the cane today?

8      A.   Yes.

9      Q.   And what -- does that injury have anything to do

10   with the January 5, 2010, incident?

11     A.   Yes.

12     Q.   It does.

13          MS. JACOBSON:  Can she put it on mute until she'd

14        like to talk?

15          MS. NATALIE JACKSON:  Yes.  Angelique, can you

16        put your phone on mute until you have something to

17        say, because we're hearing everything that's going on?

18          MS. ANGELIQUE JACKSON:  I'm hearing bits and

19        pieces, but it's okay.  I give you permission to go

20        ahead and cover for me.  We just turned around and now

21        we're going backwards on the Florida Turnpike and

22        trying to see if we can get around it, so -- we're on

23        our way, though, but you guys can continue.  I'm

24        hearing the questions.

25          MS. NATALIE JACKSON:  Okay.  But can you put your



ESQUIRE
CORPORATE SOLUTIONS

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

                                                                    10

1        phone on mute?

2              MS. ANGELIQUE JACKSON:  Oh, sure, I'm sorry.

3              MS. NATALIE JACKSON:  Thanks.

4    BY MS. JACOBSON:

5        Q.    I'll take that one back.

6        A.    Oh, you want this one?

7        Q.    Yes, yes, if you're done with it.  I don't have

8    anymore questions on this one.  So you said that your

9    visit to the emergency room -- your recent visit to the

10   emergency room was related to the January 5, 2010,

11   incident?

12       A.    Yes.

13       Q.    How is that?

14       A.    I had surgery on my knee and I had fluid

15   building.

16       Q.    When did you have that surgery on your knee?

17       A.    I don't remember the dates -- I don't remember

18   the dates.

19       Q.    And are you on any medications today?

20       A.    Not today.  I didn't take it today.

21       Q.    Okay.  Is there anything with respect to your

22   medical condition that would affect your ability to

23   remember, as we sit here today?

24       A.    Not that I know of.

25       Q.    Okay.  Anything that might affect your ability to



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

ESQUIRE
CORPORATE SOLUTIONS

Demetrius L. Baker                                    April 30, 2012

11

1     understand me, in the way of your medical condition?

2          A.    No.

3          Q.    Anything that might affect anything in your

4     medical condition that might affect your ability to answer

5     truthfully?

6          A.    No.

7          Q.    And I see you're wearing glasses?

8          A.    Um-hum.

9          Q.    Do you always wear glasses?

10         A.    Well, I got them -- I haven't had them long -- I

11    haven't had them long.

12         Q.    So when you say you haven't had them long, have

13    you had them six months?

14         A.    It's about a year.

15         Q.    About a year.  And prior to that --

16         A.    About -- about -- about -- I don't know.  Maybe

17    longer.  I don't know -- I don't know.  I -- I didn't have

18    them.  I was prescribed them; you know, I had them for

19    reading --

20         Q.    Okay.

21         A.    -- but now I have to have them.

22         Q.    So these glasses are for more than just reading?

23         A.    No, it's for reading.

24         Q.    Just for reading?

25         A.    And, you know, I know I'm finnin' to be signing



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Demetrius L. Baker                                        April 30, 2012

12

 1    something, so I want to see what I'm looking at and see

 2    what I'm --

 3        Q.   I understand.  Your glasses -- when you don't

 4    have your glasses on, are you able to see at a distance?

 5        A.   Um-hum.

 6        Q.   Okay.  And has that always been true?

 7        A.   Um-hum.

 8        Q.   Okay.  Have you ever had any problems with your

 9    long distance vision?

10        A.   No.

11        Q.   And do you currently work?

12        A.   No.

13        Q.   Are you on any kind of Social Security

14    Disability?

15        A.   Yes.

16        Q.   When did that start?

17        A.   I don't have any dates.

18        Q.   Were you on Social --

19        A.   It's been about -- I don't want to even

20    speculate, because I don't even remember exactly when it

21    was cut on, but --

22        Q.   Were you on Social Security Disability prior to

23    the January 5, 2010 --

24        A.   Um-hum.

25        Q.   -- incident?



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Demetrius L. Baker                                                    April 30, 2012

13

1      A.   Yes.

2      Q.   And what was the nature of the disability that

3   you claimed?

4      A.   It's in my medical -- the doctors -- I don't

5   know.  My dad -- I don't know.  I've been on it since

6   then.  I don't know what's the nature.  I just know I'm

7   disabled.  I claim disable.

8      Q.   Right.  You told the Social Security

9   Administration you're disabled.  Do you know if it was a

10  physical disability?

11     A.   Mental.

12     Q.   Oh, it's a mental disability.  Can you tell me

13  what kind of disability it was?

14     A.   Just, I was on -- I had to get myself back on

15  track.  I was on drugs when I was younger and I decided I

16  wanted better for my life.  And I had a chemical

17  imbalance, I learned -- I did -- you know -- I learned I

18  had and I didn't know.  And I got back on track.  I went

19  to Lakeside.  I've been off of drugs for 20 years.  My

20  oldest child is 20, so it's been 20, as of the date May

21  5th.

22     Q.   Congratulations.  Now, Lakeside, what is

23  Lakeside?

24     A.   Lakeside Alternative.

25     Q.   Lakeside?



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

ESQUIRE
CORPORATE SOLUTIONS

Demetrius L. Baker                                          April 30, 2012

                                                                    14

```
 1          A.   Alternative.

 2          Q.   Alternative?

 3          A.   Um-hum.

 4          Q.   It's near here?

 5          A.   Um-hum.  It's on Mercy Drive.

 6          Q.   And you've been going there for treatment for a

 7     long time?

 8          A.   Well, off and on, yes.

 9          Q.   Were you going to Lakeside Alternative prior to

10     the January 5, 2010, incident?

11          A.   Yes.

12          Q.   And have you gone there since the January 5,

13     2010, incident?

14          A.   After?

15          Q.   Yes, after, I'm sorry.

16          A.   Well, during the process, yes.

17          Q.   Okay.  So after --

18          A.   I'm not going now.

19          Q.   Oh, I understand.

20          A.   I'm not going now.

21          Q.   But you did go at some point after the January 5,

22     2010, incident?

23          A.   Yes -- yes.

24          Q.   And you had mentioned a chemical imbalance.  Do

25     you know if there's any other diagnosis for the mental
```



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Demetrius L. Baker                                           April 30, 2012

                                                                      15

1    disability?

2         A.    Depression.

3         Q.    Do you take any kind of -- any psychiatric drugs?

4         A.    No.

5         Q.    No.  Have you ever?

6         A.    I was prescribed, but I -- due to my drug abuse

7    or, you know, doing drugs, I've been on track.  I've been

8    maintaining without the medication.  Even my pain

9    medication, I don't -- I don't take that, you know.  I

10   don't want to be back off track --

11        Q.    No, I understand.

12        A.    -- so I choose -- I rather suffer, you know.

13        Q.    I understand.  So at some point psychiatric drugs

14   were prescribed to you?

15        A.    Yes, and I had to take them.

16        Q.    Okay.

17        A.    I had to take them.

18        Q.    When was that?

19        A.    That's been a long time ago.  That's before I had

20   kids, you know.

21        Q.    Okay.

22        A.    That's a long time ago.

23        Q.    So --

24        A.    It's been about like 20 years.

25        Q.    Okay.  So you have not taken any kind of



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

1     psychiatric drugs for --

2          A.    No.

3          Q.    -- at least five years or so?

4          A.    Right.

5          Q.    Okay.  Or more?

6          A.    Right.

7          Q.    Have you ever been a party to any lawsuit?

8          A.    Yes.

9          Q.    What kind of lawsuits?

10         A.    That's -- I mean, do I have to go all into

11    details about my --

12         Q.    No, no.  I'm just trying to find out if there was

13    other --

14              (Witness's son walks in.)

15              THE WITNESS:  That's my son.

16    BY MS. JACOBSON:

17         Q.    -- oh --

18         A.    That's my son.  I'm sorry.

19         Q.    -- if there was any other lawsuits in which

20    you've been a party, where you sued someone?  I don't need

21    to know everything about the lawsuit.

22         A.    Yes, I had --

23         Q.    I'm just trying to find out --

24         A.    -- I had surgery on my spine.  That was right

25    before -- I was just getting on my feet before this



ESQUIRE
CORPORATE SOLUTIONS

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Demetrius L. Baker                                    April 30, 2012

17

1   incident.  I was not there, but there, trying to get back

2   on my feet.

3        Q.   And from that surgery on your spine, did you end

4   up suing someone as a result of that surgery?

5        A.   Yes.

6        Q.   And was that the doctor or the hospital,

7   something like that?

8        A.   Um-hum.

9        Q.   Okay.  Any other kind of lawsuits in which you've

10  been -- either, you know, someone sued you or you sued

11  someone?

12       A.   I had a car injury that --

13       Q.   Like an auto accident?

14       A.   Yes.  I wasn't at fault.

15       Q.   Anything else?

16       A.   I had a slip and fall.  Me and my son, we was at

17  the theater.  I think it was the one right here, before

18  they closed down, Movie 12, right here.

19       Q.   Okay.  So, basically, you've had some -- it

20  sounds like you've had some lawsuits that had to do

21  with --

22       A.   Well, it was basically his, you know, so --

23  because I fell on him, you know.  He broke my fall -- he

24  broke my fall.  It could've been a lot worse.  They had

25  trash bags left in the -- in the aisles.  And when, you



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Demetrius L. Baker                                          April 30, 2012

18

1   know, like the movie is going off, they still have the

2   lights down.  And I didn't -- we didn't see it.  They was

3   in the walkway.

4        Q.   Okay.  So it sounds like a couple of -- a couple

5   of lawsuits that had to do with injuries?

6        A.   Yes.

7        Q.   Anything else, like anyone ever sued you?

8        A.   No, I haven't -- I haven't did anything.

9        Q.   And have you made any kind of claim with the

10  Orange County Sheriff's Office relating to the events of

11  January 5, 2010?

12       A.   You have to ask my lawyer.

13            MS. NATALIE JACKSON:  We did a Notice of Claim.

14            THE COURT REPORTER:  I can't hear you.

15            MS. NATALIE JACKSON:  We did a Notice of Claim.

16  I'm sorry.  We need to talk up, all of us, right?

17  Ms. Baker, you need to talk up.  Okay.

18            THE COURT REPORTER:  Thank you.

19            MS. JACOBSON:  Thank you.

20  BY MS. JACOBSON:

21       Q.   So you mentioned, you have been sober for at

22  least 20 years?

23       A.   Yes, ma'am.

24       Q.   Okay.  And that's off of drugs or alcohol or

25  anything?



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Demetrius L. Baker                                April 30, 2012

19

1       A.   Yes, ma'am.

2       Q.   Okay.  And I do have to ask this:  Have you ever

3   been convicted of any crime?

4       A.   Yes.

5       Q.   Okay.  Can you tell me that, what those were?

6       A.   Like I said, I was on drugs.  I was convicted

7   with delivery -- what am I saying -- possession of

8   cocaine, substance delivery.

9       Q.   Okay.  Anything other than drug related offenses?

10      A.   I don't know -- no.  It's been a long time.

11      Q.   So anything --

12      A.   But I've been -- I've been straight.

13      Q.   Right.

14      A.   I had some -- some convictions, but I wasn't

15  convicted of anything.  They dropped the charges.  I think

16  one was domestic violence; that was with an abusive

17  boyfriend I got rid of.  And I just had to stand up.

18      Q.   Right.

19      A.   And I had to, so -- you know, I had to take

20  whatever was coming.  I had to do what I had to do --

21      Q.   Right.

22      A.   -- to get rid of him.

23      Q.   Right.

24      A.   And it was -- it was domestic.

25      Q.   All right.  And I only want to know about



ESQUIRE
CORPORATE SOLUTIONS

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Demetrius L. Baker                                              April 30, 2012

20

```
 1     anything that was a conviction, so --
 2          A.   And they dropped the charges --
 3          Q.   Right.
 4          A.   -- but, you know, I was arrested.
 5          Q.   I understand.
 6          A.   You know, since you was asking me, have I ever
 7     been arrested.
 8          Q.   No, I understand.  And the drug related offenses,
 9     it sounds like the convictions for those would've been
10     going back at least 20 years, right?
11          A.   Um-hum.  I've been voting for four years -- four
12     or five years.
13          Q.   Okay.
14          A.   Those have been expunged, everything, so my
15     record is clean.
16          Q.   How does that work?  Do you have to get your
17     voting re-instated?  How does that work?
18          A.   Excuse me?
19          Q.   You said you've been voting for four or five
20     years.  Do you have to, like, go to someone and ask --
21          A.   I got my rights back.
22          Q.   You got your rights back.
23          A.   Um-hum.
24          Q.   How do you do that?
25          A.   I notified Tallahassee.
```


ESQUIRE
CORPORATE SOLUTIONS

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Demetrius L. Baker                                          April 30, 2012

21

1        Q.    Okay.

2        A.    And I send in my charges and I ask them each

3    year, I want it expunged.  And then it went up to two a

4    year.  And I don't know how many there are now, because I

5    got everything straightened out, because I wanted to vote.

6        Q.    Right, I understand.

7        A.    I wanted to be a part of society and do it right.

8        Q.    When did you first retain an attorney relating to

9    the January 5, 2010, incident?  When did you first hire

10   someone, an attorney?

11       A.    When I started getting harassed by the

12   officers -- the police department.  And I hired another

13   lawyer before I did Ms. Jackson -- before I met her.  And

14   I -- I don't know -- by the grace of God, I seen something

15   or somebody told me something, You need this person.  You

16   know, you really need her.  She's a woman.  She'll

17   understand, because I had --

18       Q.    Ayers?

19       A.    Ayers -- Grady Ayers.  And he had another case of

20   mine, so he had a case -- you know, he had did my -- what

21   I had for my surgery.  And he was very busy.  He was in

22   and out of court and I didn't -- you know, I didn't feel

23   like he had the adequate time for my case.

24       Q.    Did you ever speak with any kind of investigator

25   with Mr. Ayers, you know, at the same time of being with



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Demetrius L. Baker                                          April 30, 2012

22

1      Mr. Ayers?

2           A.   No.

3           Q.   No.  Did you ever met Tiffanye Breedlove?

4           A.   Yes.

5           Q.   When did you first meet her?

6           A.   I know her.

7           Q.   Okay.  How do you know her?

8           A.   You know, I'm from Apopka.  I was born and raised

9      from Apopka.  She was born and raised from Apopka.  I know

10     her.  I know her mother.  I know them when they was little

11     kids, so it's not that I met her; I know her.

12          Q.   Okay.  Had you ever met her in person, Tiffanye

13     Breedlove?

14          A.   From babies, I know them from growing up.  I know

15     their mama.  I know their family.

16          Q.   You know them, but have you actually -- had you

17     met them in person?

18          A.   I don't know what you mean by that.  I don't

19     understand what you're asking me.

20          (Attorneys Angelique Jackson and Rogell Levers

21     enters at 2:34 p.m.)

22          MS. NATALIE JACKSON:  Hello.

23     BY MS. JACOBSON:

24          Q.   Let me say this:  After the January 5, 2010,

25     incident, have you spoken with Ms. Breedlove -- Tiffanye



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

23

1    Breedlove?

2         A.   No, ma'am.

3         Q.   Have you spoken with her mother since the January

4    5, 2010, incident?

5         A.   No.

6         Q.   The next thing I want to do is I want to try to

7    find out who you have spoken with about the January 5,

8    2010, incident, apart from your lawyer, Ms. Jackson?

9         A.   This is it.

10        Q.   Okay.  Well, you spoke with, we talked about,

11   Chris Jackson.

12        A.   Yes, okay.  That's the investigator, just the one

13   on the tape.

14        Q.   That's the videotape?

15        A.   Right.

16        Q.   Okay.  And at some point you spoke with the

17   Florida Department of Law Enforcement?

18        A.   Right.

19        Q.   And then at some point you spoke with Orange

20   County Sheriff's Office investigators; is that right?

21        A.   That was -- yes -- that was -- yes.

22        Q.   Is there anyone else you have spoken with?  Did I

23   leave anyone out?

24        A.   I don't know anybody else.

25        Q.   Have you discussed the incident on January 5,



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

1      2010, with any of the therapists at Lakeside?

2          A.    Yes.

3          Q.    Now, I think you mentioned that you had had

4      spinal surgery not too long before January 5, 2010; is

5      that right?

6          A.    Right.

7          Q.    Do you remember when you had that surgery?

8          A.    It was the year before.

9          Q.    So in 2000 --

10         A.    It was like May 20th.  It was my son's birthday.

11         Q.    So some time in like May 2009?

12         A.    Um-hum.

13         Q.    Yes?

14         A.    Right.

15         Q.    Did you take any kind of pain medications

16     following that surgery?

17         A.    Of course, I had to.

18         Q.    For how long?

19         A.    Thirty days.

20         Q.    So, I guess, what I'm really trying to get at is,

21     were you taking any kind of medications for that surgery

22     on the night of January 5, 2010?

23         A.    I don't think -- it was so early in the morning.

24     And I don't take it early in the morning.  I take it after

25     my coffee or after I put something -- you have to eat



25

1     something.  You have to have something in your stomach.

2     That was 5:00 o'clock.

3         Q.   So to the best of your recollection, you did not

4     have any medications in you --

5         A.   No.

6         Q.   -- at 5:00 in the morning on January 5th --

7         A.   I had it on me.

8         Q.   I understand.  But you did not have any in your

9     system --

10        A.   Right.

11        Q.   -- on January 5, 2010, at 5:00 o'clock in the

12    morning?

13        A.   No.

14        Q.   I'm going to show you -- this is going to end up

15    getting marked as Exhibit --

16             THE COURT REPORTER:  We just did 17.

17    BY MS. JACOBSON:

18        Q.   -- 18 -- 18.  Okay.  This says, Exhibit 5,

19    because it was previously marked, but what we're going to

20    do is we're going to remark this as 18, in case you write

21    on it at any point.  So what I've shown you as Exhibit 18

22    is called a Site Plan for the Alta Westgate Apartment

23    Complex.  Do you recognize this to be the neighborhood

24    that you used to live in?

25        A.   Yes.



1       Q.   Yes?

2       A.   Um-hum.

3            (Defendant's Exhibit No. 18 was marked for

4       identification.)

5   BY MS. JACOBSON:

6       Q.   And where did you -- which building did you live

7       in, Ms. Baker?

8       A.   Building nine.

9       Q.   And I don't know if you can see on the Site Plan

10      there's a little indication down here that says North is

11      going this way.  Do you see that?

12      A.   Um-hum.

13      Q.   So it looks like North is pointing in the

14      direction of building eight and seven, if that's correct,

15      and that would mean your building was on the East; is that

16      correct?

17      A.   All I know, it was building nine, ma'am.

18      Q.   Okay.  But the diagram of this layout looks

19      correct to you?

20      A.   Yes, nine, eight, seven, yes.

21      Q.   Okay.  I'm going to give you this, so you can

22      write on it.  I'd like you to, if you wouldn't mind,

23      putting an "X" on building nine, the stairwell in which --

24      A.   How will I know it's the stairway?

25      Q.   We'll look at a different diagram, if you can't



Demetrius L. Baker                                    April 30, 2012

27

1      tell where the stairwell is on this diagram.  That's fine.

2      So at some point you ended up in the stairwell of building

3      nine, on the morning of January 5, 2010; is that right?

4          A.   Yes, ma'am.

5          Q.   And approximately what time was that?

6          A.   It was something to 5:00.

7          Q.   I'm sorry?

8          A.   It was something to 5:00.

9          Q.   Something to 5:00?

10         A.   Um-hum -- it was a little bit before 5:00.

11         Q.   Was it still dark outside?

12         A.   Very.

13         Q.   Was there any apartment lighting, you know,

14     lighting at the complex?

15         A.   Yes.

16              MS. JACOBSON:  Can I have 18 back, please?

17              THE COURT REPORTER:  Sure.

18     BY MS. JACOBSON:

19         Q.   Ms. Baker, looking at Exhibit 18, can you -- if

20     you can -- can you tell me where there was lights in the

21     neighborhood of building nine?  Are you able to draw that

22     on that diagram by circling it or making an "X" or

23     anything that would indicate whether there was lighting?

24         A.   I don't even understand the diagram.  The only

25     thing I -- I understand is that the building says nine and



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

28

1    I know that's my building nine.  But anything else on

2    here, I -- I don't see where I can indicate where the

3    lighting is at.  I mean, every light post out there?

4        Q.   No, no, I'm just talking about, where were you

5    able to see that morning?  Where was it dark and where

6    were you able to see?

7        A.   Straight out into the parking lot.

8        Q.   Was there some part of the parking lot that you

9    weren't able to see?

10       A.   No.

11       Q.   Okay.  So at some point before 5:00 in the

12   morning you were in your apartment; is that right?

13       A.   Right.

14       Q.   Can you tell me if you heard anything or saw

15   anything when you were still in your apartment that

16   morning?

17       A.   Yes, I did.

18       Q.   Okay.  First, let's -- did you see anything

19   before you left that morning?

20       A.   I looked out.  What I saw, I saw it was -- now,

21   in the back it's very dark.  There's no lighting in the

22   back.

23       Q.   That would be behind your building nine, not

24   facing the parking area, but behind the parking -- behind

25   building nine?



1        A.    Right.

2        Q.    Okay.  And you looked out in that direction?

3        A.    From my bedroom.

4        Q.    And which direction does your bedroom face?

5        A.    The direction of the field.

6        Q.    Of the field.

7        A.    (Witness nods head.)

8        Q.    You looked out into the field; did you see

9    anything?

10       A.    I -- I just seen people moving with dark colors.

11   They was in all black, I'm assuming, because I didn't see

12   any colors.

13       Q.    And did you hear anything?

14       A.    A lot of commotion.

15       Q.    What kind of commotion?

16       A.    Get down -- get down.  You need to get down.

17       Q.    So people talking, saying, Get down; is that

18   right?

19       A.    (Witness nods head.)

20       Q.    You need to say yes, so the court reporter --

21       A.    Yes.  I'm sorry -- I'm sorry.

22       Q.    That's okay.  Either yes or no, but you have

23   to --

24       A.    Yes.

25       Q.    "Um-hum" is hard for her to take down.  All



Demetrius L. Baker                                    April 30, 2012

30

1   right.  So you looked out your bedroom window and you saw

2   people out there and you heard some kind of commotion; is

3   that right?

4       A.   Right.

5       Q.   And then what did you do?

6       A.   I just -- I kind of dismissed it, you know,

7   because I was late.

8       Q.   Okay.  So when you say you dismissed it, then you

9   decided to leave your apartment?

10      A.   Right.

11      Q.   And then what did you do?

12      A.   Because I was -- I was on the phone with Darnell,

13  my friend.  I was going to get him.  I was late.

14      Q.   Okay.  Your friend, Darnell.

15      A.   Um-hum.

16      Q.   What's Darnell's last name?

17      A.   Westbrook.

18      Q.   Westbrook?

19      A.   Um-hum.

20      Q.   So you were on the phone with Darnell before you

21  even left your apartment door?

22      A.   Right.

23      Q.   Okay.  All right.  So you were on the phone with

24  Darnell and you were late and then you walked out of your

25  apartment door, so what happened after that?



ESQUIRE
CORPORATE SOLUTIONS

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Demetrius L. Baker                                    April 30, 2012

31

1      A.   Okay.  I forgot something.  I came back in.

2  That's when my family members heard it too.  And they was

3  looking out the window.  I said, I got to go.  I grabbed

4  my keys and I left and went on down the stairs.

5      Q.   All right.  So when you said your family members

6  heard it, you're talking about that commotion you

7  mentioned earlier?

8      A.   Yes, right.

9      Q.   And so you went downstairs?

10      A.   Right.

11      Q.   And you were on the phone with Darnell?

12      A.   Right.

13      Q.   So then what happened?

14      A.   He kept pushing me, Come on -- come on, we're

15  going to be late, so I was just thinking about trying to

16  get there, because he paid me the day before, you

17  understand?  And I'm just trying to do this -- you know,

18  do him this favor.

19      Q.   So your friend, Darnell, was trying to hurry you

20  up, because you'd paid -- or he paid you the day before to

21  take him somewhere?

22      A.   To the bus -- to the Greyhound Bus Station.

23      Q.   Okay.  All right.  So you're on the phone with

24  Darnell.  You're walking down the steps, then what

25  happened?



ESQUIRE
CORPORATE SOLUTIONS

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

32

1      A.   I got down -- I got all the way down to about
2   the -- right there on that second step and somebody shot
3   across.
4      Q.   You said --
5      A.   Shot across.  Somebody just shot across -- just
6   shot across.
7      Q.   You mean -- when you say, Somebody shot across,
8   you mean someone ran?
9      A.   Yes, shot across --
10     Q.   A person?
11     A.   -- just shot across like this (demonstrating).
12  And I looked on out there, you know; I was looking to see
13  what's next, you know?  I seen a --
14     Q.   Have you been to the Alta?
15     A.   I have not.  When I looked out, I saw a car over
16  by the garage.
17     Q.   I'm going to ask you to look at 18 and see if
18  there's a garage on this diagram.  Do you see a garage on
19  this diagram?  If the diagram is not helpful, just let me
20  know.
21     A.   It's along over here; it's the maintenance.  I
22  don't know what this is, but -- it's a car -- that's a
23  car?  It's a maintenance garage -- it's a garage right
24  here.
25     Q.   Okay.  So you're gesturing on the -- let's see



1    here --

2         A.    This right in here.

3         Q.    -- the south side of the complex, there's some

4    kind of maintenance garage?

5         A.    It's a garage.

6         Q.    Okay.  So that is almost directly south of

7    building 8; is that right?

8         A.    Right here, right along in here.  It was a car

9    just parked right in the middle of the road.  You could

10   tell it was in the middle of the road, because you could

11   see the garage.

12        Q.    Okay.  So let me back up.  So you saw someone run

13   by as you were standing on a step?

14        A.    Coming down the steps.

15        Q.    Coming down your steps.

16        A.    Just had made it to the step -- the second step

17   from the bottom.

18        Q.    Okay.  And then the next thing you saw was a car

19   near this maintenance garage?

20        A.    No, you asked me what I saw.

21        Q.    Okay.  I don't want to put words in your mouth,

22   so after you saw the person run by, then what did you see?

23        A.    I looked out.

24        Q.    Okay.

25        A.    And I looked to see what else -- what else.  He



1    shot by -- he shot by there and I looked out and I seen a

2    car parked over by the garage -- by the maintenance garage

3    with the lights off, tinted windows.

4         Q.   So it was not in a parking spot, it was just out

5    in the middle of the road?

6         A.   In the road.  It wasn't parked.

7         Q.   So the car parked in the middle of the road with

8    its lights off?

9         A.   (Witness nods head.)

10        Q.   Is that right?

11        A.   Um-hum.

12        Q.   What else did you see, if anything?

13        A.   That's what I seen, brake lights -- brake lights

14   and a car pulled out.

15        Q.   Okay.  And I think it might be helpful to look at

16   this diagram.  We'll make this Number 19.  So what I'm

17   showing you is a diagram.  It has building nine written on

18   it as well as building eight.  Ms. Baker, do you see on

19   here where it's marked building nine and then it shows a

20   parking area, like a parking lot area?

21        A.   Um-hum.

22        (Defendant's Exhibit No. 19 was marked for

23   identification.)

24   BY MS. JACOBSON:

25        Q.   Does that look like the parking area in front of



35

1    what used to be your building number nine?

2        A.    It doesn't resemble -- it's a lot of stuff in

3    here, that I can't say that this is the parking lot,

4    because the parking lot wasn't like that.  It wasn't this

5    and it wasn't this.  It was just a clear cut around.  It

6    was just to there.  And this is the way out.  This is the

7    other part.  You see what I'm saying?  You got brakes -- I

8    don't know.  I can't say that this is the parking lot.

9        Q.    Okay.

10       A.    That's not the parking lot that I know.

11       Q.    This is going to be 19.  I'm going to go back to

12   18 just for a second.  The parking lot on Exhibit 18, in

13   front of building nine, is that the parking lot that you

14   know?

15       A.    Correct.

16       Q.    Okay.  All right.  So you were just talking about

17   a car with taillights.  Could you tell me where in the

18   parking lot that car with taillights was?  Could you maybe

19   put a little "X" or something on that diagram?

20       A.    It was right here.  It had -- I seen the

21   taillights right here.

22       Q.    You can go ahead and make an "X" right on that

23   diagram.  That's fine.

24       A.    (Witness complies.)

25       Q.    Okay.  So you -- I don't want to interrupt the



ESQUIRE
CORPORATE SOLUTIONS

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Demetrius L. Baker                                    April 30, 2012

36

1     flow here.  You were saying you saw a car with taillights.

2     Now we know where the car with taillights was.

3          A.    Um-hum.

4          Q.    So then what did you see?

5          A.    I saw cars -- I saw a truck -- I saw one big blue

6     pickup truck came through and head -- went right straight

7     to the front of that bumper.  One came from the -- the one

8     right -- the car that was right here by the garage --

9          Q.    The one that you're saying was by the garage?

10         A.    -- it came so fast up in there.  Then it was a

11    silver SUV come up in there.  It was two cars blocking

12    that door -- blocking that side, blocking him.  I don't --

13    it was two cars.  One come from over here -- they came

14    from over here.  One back -- one was back -- I think --

15    one was facing -- facing the vehicle and one tail was

16    facing him.

17         Q.    Okay.

18         A.    You understand what I'm trying to say?  One

19    tail-end was facing the vehicle, like it was blocked in.

20    And one front -- the front of the vehicle was facing

21    his -- the other part of the truck, the side of the

22    truck -- the side --

23         Q.    Okay.  I --

24         A.    -- his -- his driver side.

25         Q.    I think I understand what you're saying, but I



1    want to make sure it's clear when someone reads this.

2         A.    Okay.

3         Q.    So it sounds like there was a blue truck that --

4         A.    That was in the -- that was in the front of

5    the -- of his black -- big black -- what do you call it --

6    SUV -- a big -- it was big trucks -- SUV.

7         Q.    Okay.  So when you say, The big black SUV, you're

8    talking about the one that you saw with the taillights on?

9         A.    Right.

10        Q.    And so when you saw the taillights on the SUV,

11   did you see -- did you see the SUV sitting there with the

12   taillights on, where you put an "X" on Exhibit 18, before

13   you saw any of the other cars?

14        MS. NATALIE JACKSON:  I'm going to object.  I'm

15        confused.

16        MS. JACOBSON:  Yes, I'll try to make it a little

17        more clear, so --

18        MS. NATALIE JACKSON:  Maybe if she refers to it

19        as Torey Breedlove's truck.

20        MS. JACOBSON:  Yes, let's do that.

21   BY MS. JACOBSON:

22        Q.    Okay.  So the car that -- the black SUV -- is

23   that what you said, it was a black SUV --

24        A.    Um-hum.

25        Q.    -- that had the taillights on --



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Demetrius L. Baker
April 30, 2012

38

1      A.    Um-hum.

2      Q.    -- that later became known to you as Torey

3   Breedlove's vehicle; is that right?

4      A.    Correct.

5      Q.    Okay.  So when you said you saw the taillights on

6   Torey Breedlove's vehicle --

7      A.    Um-hum.

8      Q.    -- did you see any other cars in the parking lot,

9   other than that one you said you'd seen over by the

10  maintenance shed, at that time?

11     A.    No.

12     Q.    Okay.  So, basically, there was Torey Breedlove's

13  car --

14     A.    If they was out there.  I didn't see them at the

15  time.

16     Q.    Okay.  So at that time there was no blue truck in

17  front of Torey Breedlove's vehicle?

18     A.    No.

19     Q.    No.  And the car that was over by the maintenance

20  shed, what color was that?

21     A.    I don't remember -- I don't remember.

22     Q.    Okay.  But it sounded to me like what you said is

23  at some point a blue truck came and went nose to nose with

24  Torey Breedlove's vehicle --

25     A.    Right.



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

1    Q.    -- is that right?  And then was it the car that
2    was by the maintenance shed that then came and went up to
3    his driver side?
4    A.    I don't -- I don't remember which one of them it
5    was.  How I know -- how can I say this, because I'm
6    confused.  Okay.  The car that was sitting at the
7    maintenance shed, it was the silver car.  It backed all
8    the way back.
9    Q.    Okay.
10   A.    It backed all the way back into the side door --
11   into his side.
12   Q.    Okay.
13   A.    And there's another one came around.  It was
14   another vehicle -- it was another vehicle at that -- at
15   the other end of his -- at the other end of the door.  It
16   was like blocked in.
17   Q.    So did --
18   A.    And then --
19   Q.    Let me make sure I understand this.  So he
20   basically had -- Torey Breedlove basically had two cars on
21   his driver side blocking him in; is that right?
22   A.    Yes, ma'am.
23   Q.    Okay.  And one of those was backing up to him, so
24   the rear of one of those cars had backed up to him?
25   A.    Yes, ma'am.



Demetrius L. Baker                                        April 30, 2012

40

1      Q.   Okay.  Had it collided with his door?

2      A.   I don't know.  I -- I -- I -- everything is

3  happening fast.  I don't remember that.

4      Q.   Okay.  But there were two cars on the driver side

5  of Torey Breedlove's vehicle?

6      A.   That was right in front of me.  That was right in

7  front of the driveway.  That's right here on that door

8  side and that front side, that truck.  And there was more

9  cars behind them.

10     Q.   And when you say, Driveway, what are you talking

11 about?

12     A.   Right here.

13     Q.   Where you put the "X"?

14     A.   Right.

15     Q.   Okay.

16     A.   Right there.

17     Q.   Can you tell me where you were from that picture?

18     A.   I was on the step.  I don't even know where the

19 steps are at, so I can't really point to where I was, but

20 here's -- I don't know -- here goes some cars -- so his

21 car was being bumped in that parking lot with that car.

22 So the right --

23     Q.   I might have another diagram that might have

24 something.

25     A.   I'm estimating here, because I'm not for sure.



ESQUIRE
CORPORATE SOLUTIONS

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

41

1    I'm not even going to estimate, because I don't know where

2    the entrance is at on here.

3        Q.    Okay.  I believe I have another diagram that

4    might have a better view of the steps at some point.

5    Okay.  When you first saw Torey Breedlove's car, it was

6    sort of parked almost in the middle of the parking lot

7    where you indicated with an "X" on Exhibit 18; is that

8    right?

9        A.    Right.

10       Q.    Okay.  And then at some point after you saw the

11   taillights, then you saw other cars come into position?

12       A.    Everything.

13       Q.    Did you see anything happen with Torey

14   Breedlove's car before those other cars blocked him in?

15       A.    No, ma'am -- well, they was pushing him back.  He

16   was rolling backwards.  He was going back towards the cars

17   that was parked already here.  One was my neighbor -- my

18   next door neighbor up, right up -- my neighbor, Rico.

19   That was they car, that it was going into, that the truck

20   was pushing.  He was just going backwards.  He was just

21   going back.

22       Q.    So you said your neighbor, Rico, had a car

23   somewhere in here.  Can you --

24       A.    The car that it was on, that's what he was

25   hitting.



ESQUIRE
CORPORATE SOLUTIONS

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

42

1       Q.    The back of -- the back of Torey Breedlove's

2    vehicle was hitting Rico's car -- truck?

3       A.    He had a SUV too.

4       Q.    Okay.  So let me ask you:  I'm not asking you to

5    say which parking spot, but can you kind of put an "R" in

6    the general area of where Rico's truck was on Exhibit 18

7    for me?  Like I said, I'm not asking you to pick a spot,

8    but I'm just trying to figure out, was he closer to

9    building eight, was he closer to building nine?

10      A.    (Witness complies.)

11      Q.    Okay.  So it looks like you put an "X" over the

12   parking spot right behind Torey Breedlove's "X"?

13      A.    Because that's where the car was.

14      Q.    But that's where --

15      A.    There was only one, two, three --

16      Q.    Right.

17      A.    -- three parking spaces.

18      Q.    Okay.  So on Exhibit 18, the "X" that is over the

19   parking -- the three parking spots to the building nine

20   side of Torey Breedlove's vehicle, that's where Rico's

21   truck had been parked?

22      A.    Yes, ma'am.

23      Q.    Thank you.

24            MS. NATALIE JACKSON:  May I see that, please?

25   BY MS. JACOBSON:



ESQUIRE
CORPORATE SOLUTIONS

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

1     Q.   So at any point had you seen Torey Breedlove's

2    vehicle back out of a parking spot?

3     A.   It was parked on that side.  He was parked where

4    I just showed you.  That's when I saw the brake lights.

5     Q.   When you saw -- where you put the "X"?

6     A.   Yes, that's where the "X" is at.  That's where it

7    stopped at, so it had to come from in one of those parking

8    spaces right there.

9     Q.   Okay.  But had you -- what you're indicating is

10    that you think that Torey Breedlove's vehicle came out of

11    a parking spot --

12     A.   From on that side.

13     Q.   -- from on the side of building eight; is that

14    right?

15     A.   Yes.

16     Q.   But did you see him actually back out of that

17    spot?

18     A.   I saw the lights.

19     Q.   Okay.

20     A.   That's when I noticed that it was a truck there;

21    it had backed out.  I didn't hear the truck.  I didn't

22    even hear it crunk up, unless it was already crunked.  I

23    don't --

24     Q.   So the --

25     A.   -- I -- I didn't -- the only thing I saw was the


ESQUIRE
CORPORATE SOLUTIONS

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

44

1    taillights and I seen how it swerved, you know, like he

2    had just pulled out.  That's when I seen the taillights on

3    the back of the truck.  And it was facing -- dang --

4    that's what made me say, dang.

5        Q.    Did you ever figure out who it was that ran by

6    when you first came down that stairwell?

7        A.    No, ma'am.

8              MS. JACOBSON:  I'll give her Exhibit 18 back, if

9        you don't mind.  Thank you.  We're up to 20?

10             THE COURT REPORTER:  Yes.

11             MS. JACOBSON:  Thank you.

12   BY MS. JACOBSON:

13       Q.    I'm going to show you a document that I'm marking

14   as Exhibit 20.

15       A.    Yes.

16             (Defendant's Exhibit No. 20 was marked for

17   identification.)

18   BY MS. JACOBSON:

19       Q.    And, Ms. Baker, do you recognize your signature

20   in the lower left corner of Exhibit 20?

21       A.    Yes.

22       Q.    And it has a date on it of October 20, 2010; is

23   that right?

24       A.    Yes.

25       Q.    Okay.  Do you remember when you saw this picture



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

45

1    before?

2        A.    That is the diagram that FDLA (sic) -- it's the

3    same thing.

4        Q.    My only real question on this one, Ms. Baker, is

5    on Exhibit 20, it seems like someone has circled building

6    nine and then kind of drawn a little line just to the left

7    of building nine, in what I thought was a stairwell.  Do

8    you see that little line I'm talking about that someone

9    drew?

10       A.    Yes.

11       Q.    Does that refresh your recollection as to that

12   being a stairwell on this diagram?

13       A.    The building -- um-hum.

14       Q.    And is that the stairwell where you were --

15       A.    Yes.

16       Q.    -- on the morning of January 5, 2010?  Thank you.

17   Okay.  I'm done with that one.  Did you see where -- I

18   know you mentioned that the one car that had been parked

19   over by the maintenance shed, that you had seen that

20   first, but did you see where the other cars that you

21   mentioned -- there was a blue truck and one other vehicle

22   that came into block Torey Breedlove's vehicle -- did you

23   see where they came from?

24       A.    They come from around building eight.  They came

25   all the way down -- they came from all directions.



ESQUIRE
CORPORATE SOLUTIONS

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Demetrius L. Baker                                         April 30, 2012

46

1          Q.    Had you seen them enter your apartment complex?

2          A.    Well -- you know what, there wasn't any lights.

3    They didn't come down with sirens or anything like that.

4    You didn't see that.  You just seen like it was a chase,

5    you know, like a chase.

6          Q.    And when you saw those cars come into the

7    complex, you said they had no lights.

8          A.    Right, correct.

9          Q.    Do you mean, police lights?

10         A.    I didn't see any lights.  I didn't see any lights

11   on the dash, the front, no lights.

12         Q.    No headlights?

13         A.    Some of them ain't have them on, some of them did

14   have headlights, some didn't.  The first ones that came

15   in, didn't have no headlights.

16         Q.    Okay.  So some had headlights, some didn't?

17         A.    Only the back, like they coming in, you know,

18   after everybody there.  Everybody there now, you know.

19   You could still see people coming in.  The whole row

20   filled up with cops.

21         Q.    Did you know they were cops when you saw them

22   coming in?

23         A.    No, I didn't.  I didn't realize that until

24   afterwards.

25         Q.    We'll get to that.  Did you see any kind of



ESQUIRE
CORPORATE SOLUTIONS

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

47

1    flashing lights or anything on any of the cars?

2        A.   No.

3        Q.   And did you say that Torey Breedlove's vehicle

4    hit Rico's truck?

5        A.   Eventually, yes.

6        Q.   Did it hit Rico's truck --

7            MS. NATALIE JACKSON:  I'm going to object.  She

8        said it was pushed into Rico's truck.

9            MS. JACOBSON:  Oh, okay.  That's what I was just

10       going to clarify -- I was just going to clarify that.

11   BY MS. JACOBSON:

12       Q.   So you saw Mr. Breedlove's car get pushed into

13   Rico's truck; is that correct?

14       A.   Right.

15       Q.   And it was pushed into Rico's truck by the blue

16   pickup truck that was nose to nose with Mr. Breedlove's

17   car?

18       A.   Yes, ma'am.

19       Q.   Before that, Mr. Breedlove did not hit Mr. Rico's

20   car then?

21       A.   No, he did not.

22       Q.   Okay.  And aside from the blue truck that was

23   going nose to nose with Mr. Breedlove's vehicle, did you

24   see any cars hit Mr. Breedlove's vehicle?

25       A.   I saw them lock him down -- lock him in.  And



Demetrius L. Baker                                    April 30, 2012

48

1    they locked in -- that was the only truck -- that was the

2    only vehicle hitting his vehicle, pushing it back.

3        Q.    Okay.

4        A.    You heard rubber spinning -- you heard tires,

5    errrrrrr (phonetic).

6        Q.    And you're making a squealing sound like --

7        A.    Yes.

8        Q.    Just for her purposes.  So you couldn't say if

9    the two cars that had blocked Mr. Breedlove's vehicle in

10   on the driver side, if they had actually touched

11   Mr. Breedlove's car?

12       A.    I can't say that.  I -- I -- I didn't -- you

13   know -- no, I can't say.

14       Q.    Okay.  All right.  So what --

15       A.    All I know, they was -- they was like that

16   (demonstrating).  I mean, you -- you touching, you

17   there -- you -- you there (demonstrating).

18       Q.    You're gesturing --

19       A.    You there.

20       Q.    -- with like a "T" --

21       A.    You're right there.

22       Q.    -- with like a "T" motion with your hands?

23       A.    You're right there -- you're right there.  The

24   only -- only thing I saw was that truck and it was pushing

25   back.



ESQUIRE
CORPORATE SOLUTIONS

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

49

1      Q.    The blue truck pushing --

2      A.    Pushing.

3      Q.    -- nose to nose with Mr. Breedlove?

4      A.    To the cars back there.

5      Q.    Okay.  Right.  To Mr. Rico's truck?

6      A.    And there were some more cars.  It was two -- it

7   was my other neighbors' cars too.

8      Q.    Okay.  What happened then after you saw those

9   trucks block in Mr. -- or all of the cars block in

10   Mr. Breedlove's vehicle; what happened next?

11      A.    I thought somebody -- I thought it was

12   somebody jacking -- I thought somebody was robbing

13   somebody or something.  It -- it -- it -- things like that

14   don't happen; only in the movies, you know.

15      Q.    Were you on the phone with Darnell at this time?

16      A.    Yes.

17      Q.    Okay.  And by the way, do you know where Darnell

18   lives?

19      A.    He's in transition.  He's -- he lost his place

20   and stuff, so --

21      Q.    Do you know, does he have a job?

22      A.    No, no -- well, he worked with a funeral home,

23   Marvin Zanders Funeral Home.

24      Q.    What was that?

25      A.    Marvin Zanders Funeral Home.



50

1      Q.   Okay.

2      A.   I don't know where he --

3           MS. JACOBSON:  Since I'm not from Orlando, do you

4      know the name of that funeral home, Ms. Court

5      Reporter?

6           THE COURT REPORTER:  No, I don't.

7           MS. JACOBSON:  You do?

8           MS. NATALIE JACKSON:  Marvin Zanders.

9           THE COURT REPORTER:  Thank you.

10          MS. JACOBSON:  Okay.  Thank you.

11          MS. NATALIE JACKSON:  Z-a-n-d-e-r-s.

12          MS. JACOBSON:  I'm not from Orlando, so I don't

13     know the name of funeral homes up here.

14     BY MS. JACOBSON:

15     Q.   All right.  So you were on the phone with

16     Darnell.  And how long were you on the phone with him?

17     A.   Enough for him to get me down them stairs.

18     Q.   Did you stay on the phone with him while you were

19     watching what was going on?

20     A.   I was hollering and screaming.

21     Q.   Pardon me?

22     A.   I was hollering and screaming.

23     Q.   You were screaming and --

24     A.   Hollering --

25     Q.   -- hollering at --



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

51

1        A.    -- and balling, trying to get up.  I wasn't
2    trying to hold no fall no more.
3        Q.    Was Darnell talking to you?
4        A.    He probably was.
5        Q.    Did you describe to him what you were seeing?
6        A.    I was just hollering -- I was just hollering.
7    The phone dropped and I kept it moving.
8        Q.    So at some point you dropped the phone?
9        A.    I dropped the phone.
10       Q.    From where you were standing, you were on the
11   second step from the bottom in the stairwell of building
12   nine, could you see the wheels on Mr. Breedlove's vehicle?
13       A.    Yes.
14       Q.    And could you describe the wheels to me?
15       A.    He had them big wheels.  It was big wheels.
16       Q.    Could you see --
17       A.    I know they was going backwards.  They was -- he
18   was being pushed back --
19       Q.    Was he --
20       A.    -- because you could see the smoke.  I don't
21   know.  It was just -- you could just smell the rubber.
22   You could -- you could see -- you could hear it,
23   errrrrrr.
24       Q.    More squealing sounds --
25       A.    Yes.



Demetrius L. Baker                                      April 30, 2012

1      Q.    -- is what you heard?

2      A.    Yes.

3      Q.    Is that right?

4      A.    Yes.

5      Q.    Could you see the direction his tires were

6    pointed in?

7      A.    What do you mean?

8      Q.    Were they straight?  Were they to the side?

9    Could you tell which direction he had his wheel pointed

10   in?

11     A.    Whenever he pulled back, however he pulled back,

12   that's how he was facing.  And they pushed him back, you

13   know, pushed him back.  I don't know what direction.  I

14   don't -- I don't -- I don't know which direction of the

15   tires.  I don't -- I don't understand that one.

16     Q.    Now, when you saw the taillights at the very

17   beginning, before any other cars came and blocked him in,

18   did you see how -- I know you haven't seen him in the

19   parking spot, but did you see the car moving when you saw

20   the taillights or was it just standing still with

21   taillights?

22     A.    It -- I don't know whether I was looking toward

23   that direction when I came out.  I always look this way

24   (demonstrating).

25     Q.    To the left?



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

53

1       A.    To the left.  I was looking to the garage and I

2   saw the car, you understand?  I don't know, did he --

3       Q.    The one by the maintenance shed?

4       A.    -- pull out while I was looking at the car, but

5   when I looked over here, I saw the taillights where he

6   already had done pulled out, you understand?

7       Q.    Okay.  Yes, I do.

8       A.    There wasn't no car come down there.  I'm looking

9   now, but I'm going this way, you know what I'm saying?

10  When I looked back over here, I saw the car -- I seen the

11  car.  I seen the taillights of the car.  And I saw Rico's

12  truck and it was like it was -- it wasn't that -- you

13  know, it wasn't that -- I don't know.

14          I can't estimate that, but you know how you pull

15  out and you're like, gosh, you know?  But when he came and

16  bumped him, that left no room for him to (smacking sound)

17  hit his truck, you understand?  It wasn't (smacking

18  sound) -- when he hit, bumper to bumper, that's when you

19  hear all the commotion.

20      Q.    Okay.  So when you came -- when you say you

21  looked to the left and saw the truck -- the car by the

22  maintenance shed and by the time you looked to the right

23  you saw Torey Breedlove's vehicle, the taillights, but you

24  did not see the car in motion at that point; is that

25  right?



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Demetrius L. Baker
April 30, 2012

54

1        A.    I saw the car -- right, correct.

2        Q.    Okay.  And so let's go back to where you were

3    saying you were afraid that he was going to get jacked.

4    What made you think that?

5        A.    I just thought that, how they charged in and

6    you -- you don't see that kind of stuff.

7        Q.    Were people still in their cars at this point?

8        A.    What do you mean?

9        Q.    The people who were driving those cars, that

10   blocked him in, were they still in their cars at this

11   point?

12       A.    No, ma'am.

13       Q.    Okay.  People had gotten out of the cars?

14       A.    Yes, ma'am.

15       Q.    So tell me about that.

16       A.    What do you want me to tell you?

17       Q.    When did you first see people get out of the cars

18   that were blocking him in?

19       A.    As soon as they blocked him in; they jumped out,

20   four, five, three.  They came from all directions.

21       Q.    And then what did they do?

22       A.    They was in all black.  They was camouflaged.

23       Q.    So the people that got out were wearing black or

24   camouflage?

25       A.    Yes, ma'am.



ESQUIRE
CORPORATE SOLUTIONS

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Demetrius L. Baker                                    April 30, 2012

55

1          Q.   Were they wearing any kind of police vests or

2    anything like that?

3          A.   No, ma'am.

4          Q.   Could you tell anything about the people, other

5    than the fact that they were wearing black and camouflage?

6          A.   Nothing.  you didn't even know their skin color.

7    They had everything -- you couldn't tell nothing, just

8    black --

9               MS. NATALIE JACKSON:  I'm going to ask for

10         clarification.

11              THE WITNESS:  -- faces.

12              MS. NATALIE JACKSON:  Is it black and camouflage

13         or black camouflage?

14              MS. JACOBSON:  I said black or camouflage.

15              MS. NATALIE JACKSON:  Correct.  When you were

16         talking about --

17              THE WITNESS:  It was different.

18   BY MS. JACOBSON:

19         Q.   So some people were wearing black; is that right?

20         A.   Correct.

21         Q.   And some people were wearing camouflage; is that

22   correct?

23         A.   With black.

24         Q.   Oh.

25              MS. NATALIE JACKSON:  That's what I was



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

56

1          wondering.

2                    MS. JACOBSON:  Okay.

3                    MS. NATALIE JACKSON:  She was saying, Camouflaged

4          black.  I'm wondering if she really meant --

5     BY MS. JACOBSON:

6          Q.   Oh, so you're not talking about military

7     camouflage; you're talking about people who had

8     camouflaged themselves in all black?

9          A.   Black and then some had on camouflage.

10         Q.   But military camouflage?

11         A.   Military camouflage.

12                   MS. NATALIE JACKSON:  Oh, okay.

13                   THE WITNESS:  They had on both.  It was -- they

14         had on both.

15                   MS. NATALIE JACKSON:  I'm sorry.

16                   THE WITNESS:  They had on the military stuff.

17         Their faces was still black.  They had black -- you

18         couldn't tell.  You couldn't -- you couldn't tell.

19    BY MS. JACOBSON:

20         Q.   You couldn't even tell what race these people

21    were?

22         A.   Right, you couldn't tell -- you couldn't tell.

23         Q.   And so you're saying, you know, people got out of

24    their cars and that these people in black or camouflage

25    got out of the cars and then what happened?



ESQUIRE
CORPORATE SOLUTIONS

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Demetrius L. Baker                                            April 30, 2012

57

1        A.    With guns.

2        Q.    Okay.  With guns.  Then what happened?

3        A.    Drawn.

4        Q.    Okay.

5        A.    Aimed.  And in a split second they said, What you

6    gonna do, Boy?  He was like this (demonstrating).  The boy

7    was like this (demonstrating).  He was like this

8    (demonstrating).

9        Q.    You're gesturing that he had surrendered?

10       A.    I mean, I -- I gestured, yes, like this

11   (demonstrating).  That means he's like this

12   (demonstrating).  And they opened fire.  They just

13   started.

14       Q.    So from where you were standing, you could see

15   that Mr. Breedlove had surrendered?

16       A.    He's like this (demonstrating).  He's like this

17   (demonstrating).

18       Q.    And I -- and I keep just saying that you're

19   indicating --

20       A.    Yes.

21       Q.    -- hands up, surrendered?

22       A.    His hands were up.  He was like this

23   (demonstrating) in the seat, just like this

24   (demonstrating).  Just like that (demonstrating) in the

25   seat.  Like, oh my -- I'm like, oh my God.  I'm imagining,



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Demetrius L. Baker                                    April 30, 2012

58

1   he's saying -- because they was -- it was so quick.

2        Q.    Now, he had his hands up.  Had anyone started

3   shooting at this point yet?

4        A.    No, not at that point.

5        Q.    And could you hear -- I know you mentioned that

6   the men with the guns were saying things to him.  Could

7   you hear anything that Mr. Breedlove was saying?

8        A.    He said nothing.

9        Q.    And at this point were there any police lights

10  or --

11       A.    (Witness shakes head.)

12       Q.    You're saying, no?

13       A.    No, ma'am.

14       Q.    At this point were there any sirens?

15       A.    No, ma'am.

16       Q.    All right.  So then what happened?

17       A.    They started shooting.  Shot him -- they shot

18  him.

19       Q.    And could you -- the entire time you were

20  watching Mr. Breedlove, could you see his hands were up

21  this entire time?

22       A.    Yes, ma'am.

23       Q.    Could you hear whether or not his engine was

24  revving?

25       A.    No, ma'am.



ESQUIRE
CORPORATE SOLUTIONS

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Demetrius L. Baker                                    April 30, 2012

                                                            59

1        Q.   And, Ms. Baker, remember I said, if you need to
2   take a break, we can take a break at any time.
3             MS. NATALIE JACKSON:   I need a clarification on
4        that.  Your last question was, did she hear --
5             MS. JACOBSON:   Engines revving --
6             MS. NATALIE JACKSON:   And was that, No, ma'am --
7             MS. JACOBSON:   -- at any --
8             MS. NATALIE JACKSON:   -- she didn't or no, ma'am,
9        she didn't hear?
10  BY MS. JACOBSON:
11       Q.   Let me clarify.  Did you hear engines -- did you
12  hear any engines revving --
13       A.   Yes, ma'am.
14       Q.   -- during the shooting?
15       A.   No, not during the shooting.
16       Q.   When did you hear engines revving?
17       A.   Before the shooting.
18       Q.   Before the shooting.  Could you tell whose engine
19  was revving?
20       A.   The blue truck, pushing him back -- pushing him
21  back.
22       Q.   And can you say that Torey Breedlove's engine was
23  not revving?
24       A.   (Witness shakes head.)
25       Q.   You don't --



ESQUIRE
CORPORATE SOLUTIONS

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Demetrius L. Baker                                          April 30, 2012

60

1      A.   I can say, I -- I didn't hear his engine running.

2    I just heard -- I could see the smoke around the big tires

3    on the blue truck, in the big F-150.  It's a big -- big

4    F-150.  You could -- you could see the smoke around it.

5    You know how you see tires -- you could see it.

6      Q.   Was there any kind of vehicle behind that blue

7    truck?

8      A.   Yes, ma'am.

9      Q.   So there was another --

10      A.   A lot of them.

11      Q.   Okay.  Was there any vehicle literally bumping up

12    against the rear of the blue truck, you know, with its

13    nose to the rear-end of the blue truck?

14      A.   I -- I don't know.  I -- I saw the car.  I was

15    looking.  I'm trying to catch it all, you know.  Like I

16    said, it happened so fast.

17      Q.   So before the shooting you heard some engine

18    revving; is that right?

19      A.   Yes, ma'am.

20      Q.   And you think it was the engine of the blue

21    truck?

22      A.   The blue truck was pushing the black truck -- SUV

23    back.

24      Q.   Okay.  And then -- then you were saying that's

25    when the shooting started, at some point after that?



Demetrius L. Baker                                      April 30, 2012

61

1      A.    Yes, I said they came out.  They jumped out of

2   the cars and they set up by the center, but it was

3   something going on in the back.

4      Q.    You mean, in the field?

5      A.    In the field.

6      Q.    Did the person who was driving the blue truck,

7   did he get out?

8      A.    The police?

9      Q.    Well, whoever was driving the blue truck.

10     A.    Well, he had a police thing on after -- you

11   know -- after daybreak came.  That's when I knew he was a

12   police.

13     Q.    Okay.  So the man who was driving the blue truck,

14   when you said everyone got out of their cars, was he one

15   of the people that got out?

16     A.    Yes, ma'am.  He had a big -- big gun.

17     Q.    And so tell me what happened after the shooting

18   started.  Did the shooting just continue until it stopped?

19     A.    Stopped, you heard like ding, ding, things

20   falling.  You could see stuff falling in the street, like

21   from the guns.  And then once all the -- all -- all -- all

22   them shots was shot, it was like all of them came out --

23   came out the thing, click, click; they put them back up in

24   there.  Everybody looked -- it looked like everybody

25   recharged and they hit him again.  And he was still up



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Demetrius L. Baker                                    April 30, 2012

                                                            62
1      like this (demonstrating).  He was like this

2      (demonstrating) here.  He was still like this

3      (demonstrating) here.

4          Q.    With his hands up?

5          A.    And when they was shooting him, he was like

6      bouncing like a rubber ball (demonstrating).

7          Q.    So, Ms. Baker --

8          A.    That's all he did.

9          Q.    What you were --

10         A.    That's all the did.

11         Q.    -- what you were describing as a click, was the

12     reloading; is that right -- the reloading of their guns?

13         A.    Yes, they had black things hit the ground.  Some

14     of them was this long.  Some of them was this long.  Some

15     of them -- they was all different shapes, different

16     sizes.  You could see them hitting the ground -- you could

17     see it.  You could hear bullets, cling, cling, cling,

18     cling, cling, cling, cling.

19              You could hear it hitting the ground, all of

20     them.  And you could hear them (smacking sound) -- you

21     could hear them things going back up and click.

22         Q.    To reload their weapons?

23         A.    I'm assuming that's what they did, because they

24     started back shooting.

25         Q.    Okay.  How many people do you think were shooting



63

1    at this point?

2         A.    Ma'am, it was about 15 to 16 cars --

3         Q.    Fifteen to sixteen.

4         A.    -- of people out there.  When daybreak hit,

5    everything changed.  I -- you didn't see these people.

6    You didn't see these cars.  All the cars that were

7    blocking -- you didn't see none of this.

8         Q.    Now, did the 15 or 16 people that were shooting,

9    did it seem to you like as if they all reloaded their

10   weapons at the same time?

11        A.    (Witness nods head.)

12        Q.    You're saying, yes?

13        A.    Yes -- yes, ma'am.

14        Q.    Would you like to take a break?

15        A.    No, I want to get it over with -- get it over

16   with, please.

17        Q.    Okay.  I understand.  So is it your understanding

18   that the only time that the shooting stopped was during

19   the time that these men were reloading their weapons?

20        A.    Yes, ma'am.

21        Q.    Did you hear anything else during the time that

22   they were reloading their weapons, other than the click

23   sound of the reloading of the weapons?

24        A.    Yes, ma'am.  They was saying, Who the fuck that

25   is?  I was screaming, hollering, Don't shoot him; don't



ESQUIRE
CORPORATE SOLUTIONS

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

64

1    kill him.  Please don't shoot him no more.  Don't shoot

2    him no more.  I was just screaming and yelling and by

3    then --

4         Q.   So let me see if I understand and I know -- I

5    know you want to get through this.  So I apologize, I do

6    have to ask these questions, because I wasn't there, so I

7    have to find out, you know, what happened and report back

8    to the insurance company that I represent.  But it sounds

9    like what you're saying is during that period of time,

10   that the --

11            MS. JACOBSON:  Thank you, Natalie.

12            THE WITNESS:  Thank you.

13   BY MS. JACOBSON:

14        Q.   During that period of time that you heard these

15   men reloading their weapons, you were stating something to

16   them.

17        A.   I was screaming, Stop, don't shoot him no more.

18   They went a whole round -- they went a whole round.

19        Q.   And then they were saying something back to you,

20   at that point?

21        A.   Yes, ma'am.

22        Q.   What were they saying to you?

23        A.   They told me to, Shut the fuck up, bitch.  You

24   need to get back up them stairs.  Ain't nothing down here

25   to see.



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Demetrius L. Baker                                      April 30, 2012

65

1      Q.   Okay.  And during that time that the men were

2   reloading their weapons, is that the only thing that you

3   heard, was what you said to them and what they said to

4   you?

5      A.   I was screaming and hollering.  Like I said, when

6   they shot -- they took off and they shot at -- they

7   shoot -- it was like momentarily.  It was -- it was no

8   sooner than this (smacking sound), then they did this here

9   (smacking sound).  And I'm screaming and hollering.  It

10   didn't matter -- it didn't matter.

11      Q.   Let me -- let me --

12      A.   It didn't matter.

13      Q.   -- let me ask you:  How much time do you think

14   passed between the time that they --

15      A.   I don't know.

16      Q.   -- stopped shooting and when they reloaded and

17   started shooting again?

18      A.   As long as it takes to do one of them guns,

19   however long that takes.  I don't know.  I wasn't trying

20   to time nobody.  I went out that apartment for a reason,

21   you know.  I'm -- I'm not trying to be funny, but I don't

22   know how long it takes to -- to -- to do one of those guns

23   and to reload or to shoot.  I don't know.

24      Q.   I understand.  So during that time that they were

25   reloading the guns, I just want to make sure that I



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

ESQUIRE
CORPORATE SOLUTIONS

1    understand, you heard the sound of the reloading and you

2    heard them -- these men -- saying something to you in

3    response --

4        A.   Yes, ma'am, all momentarily.

5        Q.   Right.

6        A.   This is all going on at the same -- all this is

7    going on at the same time.  Then they start back

8    shooting -- they start back shooting -- they start back

9    shooting.

10       Q.   I'm just trying to find out if you heard anything

11   else during that period of time that they were reloading?

12       A.   Well, I ain't have to hear them, ma'am.  When I

13   realized they were shooting at me too, it was time for me

14   to go.

15       Q.   Of course.  And I'm going to ask you about that.

16       A.   Okay.

17       Q.   I'm going to ask you about that.  So at what

18   point did you realize that they were shooting at you?

19       A.   When I had -- when I told you it was happening at

20   the same time.  I can't give you no time -- time, because

21   everything was going on at the same time.  You understand?

22       Q.   Yes.

23       A.   Okay.  I was seeing them reloading -- I'm seeing

24   this.  All right.  I'm hearing him talking.  I know -- but

25   I'm screaming.  I'm trying to get up everybody in my



 1       building now, because he shot -- he shot -- he shot

 2       multiple -- so many times, you know, I saw him going like

 3       this (demonstrating).

 4              Before I have to see it again, I hollered, I

 5       screamed.  I fell.  I broke something.  I felt my toe

 6       break on the rail, trying to get back up.  I heard a

 7       crack.  I pulled.  I did everything I could to get back

 8       up.  It was so cold.

 9       Q.   It was cold?

10       A.   It was so cold.

11       Q.   Let me ask you:  You mentioned "him."  Was there

12       only one person that was shouting at you?

13       A.   I don't know.  I just know he got their

14       attention.  That's all I figure.  I don't know -- I don't

15       know.  I just know, they wanted -- wait a minute.  Who the

16       hell hollering?  I'm -- by then, I'm -- I'm -- I'm down

17       now.  I'm -- I'm down on the steps squatting -- squatting,

18       hollering, screaming and hollering.

19       Q.   So did the men who were shooting, did they know

20       you were there until you started hollering?

21       A.   Yes.

22       Q.   They knew?

23       A.   They knew I was there.  They just -- I don't

24       know.  I guess I was -- I was screaming and hollering.

25       I'm looking, but I'm screaming and I'm hollering.  I'm



Demetrius L. Baker                                        April 30, 2012

68

1    just screaming and I'm hollering.  Ask my neighbors.  They

2    would tell you, I screamed and I hollered, trying to get

3    somebody else to come outside.  Let somebody else see

4    this.

5         Q.   So like I said, during that period of time that

6    they -- the men were reloading their weapons and you're

7    screaming at them to stop and one of them tells you

8    something like, Get away.

9         A.   Shut the fuck up, bitch.

10        Q.   Had they started shooting at you yet at that

11   point?

12        A.   If they had, I hadn't realized it, not then,

13   until that bullet hit that rail and hit that fire escape,

14   and that's right there.  It's on the step.  That's right

15   there.  The fire escape is right there.  The rail is

16   right -- my hand's on the rail, because I'm clenching it,

17   because I'm down, you know.

18             And I -- I know I had -- when I got ready to get

19   up, I was locked.  My legs was locked.  So I rolled.  I

20   tumbled and I got back up them stairs.  I got back up them

21   stairs.

22             Then another shot came up on the wall.  And then

23   I -- by that time, I had done tried to get myself up on

24   the steps, so I go climb them and get on out the way,

25   before they shoot me in my back or something.  By that



ESQUIRE
CORPORATE SOLUTIONS

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Demetrius L. Baker                                                                April 30, 2012

69

1    time, another bullet came and hit the wall and I fell.  I

2    fell and I know this knee went out (indicating), because

3    it had -- I had busted my knee, I know, because I went

4    right on my kneecap on the staircase, on that sharp part.

5        Q.   And let me ask you --

6        A.   And then I crawled the rest of the way.

7        Q.   And I'll get to that in a minute, but before we

8    go away from what we were talking about -- when you were

9    down on that second step from the bottom and you thought

10   they were shooting at you, were they --

11       A.   I didn't think they were shooting at me, ma'am, I

12   know they was shooting at me.

13       Q.   Okay.  So at that point in time, were they also

14   still shooting at Mr. Breedlove?

15       A.   Yes, ma'am.

16       Q.   Okay.  When did you hear any of the shooting

17   stop?  Where were you at the time that you heard the

18   shooting stop?

19       A.   I had done made it around the wall of 201.

20       Q.   So you had made it up to the second floor of your

21   apartment stairs; is that correct?

22       A.   Yes, ma'am, I made it up them stairs.

23       Q.   Okay.  And you made it up the stairs and you had

24   made it around the corner to an apartment --

25       A.   No, it wasn't around no corner.



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

1      Q.   Okay.

2      A.   It was just a big block.  Right at the front

3  door, it was a block at the wall, that come out the wall

4  by that -- about this much.  And I said, Get behind that

5  wall, because they're going to shoot me in my back, you

6  know.  If you could've seen them bullets hit that boy.

7      Q.   And it was after you got around that wall, that

8  you just described, that you finally heard the shooting

9  stop; is that correct?

10     A.   A little bit after that.  When they came up to my

11 door, my son, he was ducking.  They was still shooting.

12 It was whole clips.  They got clips like this

13 (demonstrating) and clips like this (demonstrating).

14          They had a big cannon -- cannonball.  You heard

15 that.  It united the whole truck.  Fire went everywhere.

16     Q.   So there was some -- there was some weapon that

17 was shot that had almost like a fireball, is what you're

18 saying?

19     A.   It was cannon.  It was like a bomb.  You had done

20 shot that boy.  Why you go do that?  I mean, I'm just

21 saying.  You had just shot two clips and it just went

22 through him and you going to shoot that thing in there?

23 This is -- this is so sad -- so sad -- so sad.

24     Q.   You want to take a break, Ms. Baker?

25     A.   Yes.


ESQUIRE
CORPORATE SOLUTIONS

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

71

1            (A brief break was taken 3:38 - 3:40 p.m.)

2            MS. JACOBSON:  What exhibit am I up to?

3            THE COURT REPORTER:  Twenty-one.

4            MS. JACOBSON:  Twenty-one.

5      BY MS. JACOBSON:

6        Q.   I'm going to show you a picture that we're going

7      to mark as Exhibit 21.  And really the only thing I want

8      to know on this picture, do you recognize this picture?

9        A.   Yes, ma'am.

10            (Defendant's Photograph Exhibit No. 21 was marked

11      for identification.)

12      BY MS. JACOBSON:

13        Q.   Okay.  I just want to make sure I understand that

14      there's a gray vehicle in the forefront that's facing us,

15      when we're looking at the picture; is that right?

16        A.   Um-hum.

17        Q.   Is that one of the vehicles that you said had

18      blocked in Mr. Breedlove's vehicle?

19        A.   Yes, ma'am.

20        Q.   Okay.  And then over to the left of that gray

21      vehicle, that's facing us, I see what looks like a blue

22      truck.  Is that the one that you said was facing

23      Mr. Breedlove's vehicle?

24        A.   Yes, ma'am.

25        Q.   Okay.  And then the black vehicle, we can only



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Demetrius L. Baker                                      April 30, 2012

72

1     see part of it, behind the gray vehicle.  Is that

2     Mr. Breedlove's vehicle?

3          A.   The one sitting right here?  The one --

4          Q.   Yes, the one that you can only --

5          A.   Yes.

6          Q.   -- see the rear-end of the car.

7          A.   Yes, that's the back.  That's the one I saw

8     pulled out -- that's the one I saw with the taillights

9     right here.

10         Q.   Okay.  And do you see -- on this picture, do you

11    see Rico's truck?

12         A.   Rico's right here.

13         Q.   Okay.  So Rico's truck is sort of like a grayish

14    vehicle?

15         A.   And this here -- this here is the girl next door

16    to me, the blue car, this one right here.  All these

17    cars -- we all stay on the same floor.  Rico just stay up

18    top of me, 201.

19         Q.   Did Mr. Breedlove's vehicle collide with any

20    other vehicle other than Rico's vehicle?

21         A.   No.  Did his vehicle hit -- I don't know whether

22    his vehicle hit that other car or not.  I don't know

23    whether it even hit this car.  All I know, I saw this

24    here, vehicle here, pushing this vehicle back.

25         Q.   So you saw the --



Demetrius L. Baker                                        April 30, 2012

73

1      A.   And I saw the -- you could see the smoke from

2    right here.  I was on the stairs.  You could see the

3    tires -- you could see the tires in motion, like they was

4    going forward, you understand?

5      Q.   So what you're saying, what you could see was the

6    blue truck pushing Mr. Breedlove's vehicle back?

7      A.   Yes, I saw this here going back.  I don't know

8    whether he pulled from over -- he didn't -- I say, he had

9    to pull from right here (pointing).

10      Q.   You're pointing --

11      A.   Right here (pointing).

12      Q.   -- you're pointing towards building eight; is

13    that right?

14      A.   Yes, ma'am, this is building eight.

15      Q.   Do you still have that pen on you?  Can I ask you

16    to maybe put an arrow towards Rico's truck, if you don't

17    mind?

18      A.   I just did that.

19      Q.   Oh, I mean, but I --

20      A.   It's right here.  I put it right there.

21      Q.   Did you put an arrow on that?

22      A.   No, I put it on the other one, right there.  It's

23    just right there.

24      Q.   Yes, I just -- could you use my pen and just put

25    an arrow going to Rico's truck, just so that I know what



Demetrius L. Baker                                      April 30, 2012

74

1    Rico's truck looks like?

2         A.   (Witness complies.)  It looks like it ain't

3    coming out.  Can you see that?

4         Q.   I think so.

5         A.   It's not showing up on the -- I tried to --

6         Q.   No, no, I see it.  It looks like -- it looks like

7    you made a little arrow on the grass, pointing towards --

8         A.   The truck.

9         Q.   -- the gray or silver --

10        A.   Yes.

11        Q.   -- truck.  Okay.  And that's on Exhibit 21?

12        A.   Yes.

13        Q.   Okay.  This should be my last picture, so you

14   know that I'm not going through this whole stack.  This

15   we're going to make Exhibit 22.  And, Ms. Baker, do you

16   recognize Exhibit 22, this picture of the Alta Westgate

17   complex; do you recognize that?

18        A.   Yes, ma'am.

19             (Defendant's Photograph Exhibit No. 22 was marked

20   for identification.)

21   BY MS. JACOBSON:

22        Q.   And I'm just trying to figure out if -- where is

23   this maintenance shed that you had been describing

24   earlier?

25        A.   Right here, right there, that's the shed right



75

1    there (pointing).

2         Q.   I'm going to have you circle the maintenance shed

3    on Exhibit 22, if you don't mind.  You can write on top of

4    that thing, so that it doesn't -- you got it?

5         A.   (Witness complies.)

6         Q.   Okay.  So on Exhibit 22, we have a circle on top

7    of the maintenance shed; is that right?

8         A.   Um-hum.

9         Q.   Yes?

10        A.   Yes, ma'am.

11             MS. NATALIE JACKSON:  I didn't see where she --

12             MS. JACOBSON:  She circled right on top of the

13        shed.

14             MS. NATALIE JACKSON:  Okay.  Thank you.

15   BY MS. JACOBSON:

16        Q.   So let me go back to some of the questioning I

17   was doing earlier and I apologize, but I have to go over

18   this, but I've got to find out what was happening.  When

19   you saw the men reloading their weapons, what were you

20   looking at, at that time?  Were you looking at the men

21   reloading their weapons?

22        A.   I was looking at everything.

23        Q.   Okay.  Could you see Mr. Breedlove at that time?

24        A.   He was like this (demonstrating).

25        Q.   He had his hands up at that time?



ESQUIRE
CORPORATE SOLUTIONS

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Demetrius L. Baker                                       April 30, 2012

76

1      A.    He was like this (demonstrating).  He was shot

2   up.  They had done put a whole round -- a whole round -- a

3   whole round, from all them polices --

4      Q.    So --

5      A.    -- the first time.

6      Q.    Right.  So after the first time that they shot

7   him, they were reloading their weapons; it that right?

8      A.    Yes, I'm steady screaming and hollering.

9      Q.    And at that point you could see Mr. Breedlove; is

10  that right?

11     A.    Yes, and I said, Don't shoot him.  I said,

12  Don't -- don't kill him.  Don't shoot him no more.  My

13  God, don't shoot him no more.  That's all I kept saying.

14     Q.    Right.

15     A.    He was like -- he was -- he was just like this

16  here (demonstrating), like he was stuck to that seat.

17     Q.    So at the time that they were reloading their

18  weapons, you could see him with his hands up in a

19  surrendered type fashion?

20     A.    Ma'am, he was stuck to that seat.

21     Q.    Do you think he was alive at that point?

22     A.    I don't know.  He was twitching after -- after

23  they came and checked him.  And he was still moving.

24  That's what I -- I -- I couldn't understand.  Why they

25  stopped the medical -- why they stopped the ambulance from



ESQUIRE
CORPORATE SOLUTIONS

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Demetrius L. Baker

April 30, 2012

77

1    coming in the gate and he was still in there moving?

2        Q.   So you're saying --

3        A.   Call it shock, whatever you call it, I don't -- I

4    don't know what your body go into.  All I know is when

5    you've got a form of life in your body, medical attention.

6        Q.   So the last you saw Mr. Breedlove, he was moving

7    in some fashion?

8        A.   Like (demonstrating).

9        Q.   Like a twitch, is what you're saying?

10       A.   He was moving -- he was moving.  He was -- I know

11    you call it twitch.  I don't know what you twitch after.

12    I never been shot before, so I can't tell you that.  So I

13    don't know what you call it.  I don't -- I -- I -- that's

14    what -- he was (demonstrating).  He was just

15    (demonstrating) like that.

16       Q.   Could you hear Mr. Breedlove at the time that the

17    men were reloading their weapons?

18       A.   I didn't hear nothing.

19       Q.   You didn't hear Mr. Breedlove --

20       A.   I'm -- I'm not focusing on him right now, because

21    I already see his situation right now.  I'm focusing on me

22    right now.  It was about me, because I -- I realized I'm

23    being shot at, you understand?  I -- I stopped focusing.

24    It wasn't even about him no more, because I saw this here,

25    the way it went.



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Demetrius L. Baker                                         April 30, 2012

78

1          Q.   Well, let's go back to when you had gotten out
2     behind the wall on the second floor of your apartment
3     complex.
4          A.   Um-hum.
5          Q.   Where did you go after you were behind that wall?
6     Did you go somewhere?
7          A.    I crawled to that wall.  When I got -- when they
8     came and got me, that's when I got back in my house, back
9     down.  People started coming out.  People started coming
10    out then, you know, so it really didn't matter, because
11    other people was out there and they're going to the rail
12    and they're going to see.  And they see now something
13    ain't right here, you know what I'm saying?
14          And they was talking -- everybody in my building,
15    the Sheriff's Department talked trash.  We pay rent.  We
16    just paid rent.  Who's going to tell you to shut the fuck
17    up and go back in the house?  You just paid your rent.  I
18    mean --
19         Q.   So who came and got you, Ms. Baker?
20         A.   My kids -- my kids.  They drug me -- they drug
21    the rest of me to the door.
22         Q.   Into your own apartment?
23         A.   To my own apartment.
24         Q.   Okay.  And does your apartment have any window
25    that faces the parking lot?



ESQUIRE
CORPORATE SOLUTIONS

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

79

1        A.    No -- no.  They probably thought I went in there,

2    because they shot all up in them apartments.

3        Q.    At what point did you find out that those men

4    with the guns, that they were police?

5        A.    When, right before -- right -- right -- right

6    before daybreak.  Daybreak had started setting in.  We sat

7    out there and watched that boy's body until he turned

8    white.

9        Q.    When you said --

10       A.    He had froze.

11       Q.    When you say, Sat out there, where were you

12   sitting?

13       A.    You got it in the picture, I think.

14       Q.    One of the colored pictures, Ms. Baker?

15       A.    I think so.  We were on the railing.

16            MS. NATALIE JACKSON:  I think it's Exhibit 21,

17   I'm guessing.

18            MS. JACOBSON:  This one?

19            MS. NATALIE JACKSON:  Is it that one?

20            THE WITNESS:  No --

21            MS. JACOBSON:  That's building eight.

22            THE WITNESS:  -- that's building eight.

23            MS. NATALIE JACKSON:  Oh.

24   BY MS. JACOBSON:

25       Q.    This is Exhibit 22.



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Demetrius L. Baker                                    April 30, 2012

                                                              80

1        A.   We was in that breezeway, right there -- right

2    there (pointing).  You could see --

3        Q.   I'm going to have you circle that as well, if you

4    don't mind.

5        A.   (Witness complies.)

6        Q.   So on Exhibit 22, you're circling -- what did you

7    say -- a breezeway?

8        A.   That's up there -- that's right there

9    (pointing).  That's the rail.  You could see everything.

10       Q.   I'm going to ask you to make that a little

11   darker, the circle, sorry.  I don't know if my pen's

12   dying.

13       A.   (Witness complies.)

14       Q.   Thank you.  Okay.

15       A.   And ain't nobody could come down, so you couldn't

16   even come down.

17       Q.   So at some point after you were in your

18   apartment, you went back out to the breezeway; is that

19   right?

20       A.   Yes, I realized I was messed up.  I had -- I was

21   trying to get -- go to the -- I was trying to get medical

22   attention.  They -- they stopped the ambulance -- the

23   second ambulance from coming in the gate.

24       Q.   What made -- so the reason you came out of your

25   apartment and went to the breezeway, was because you



ESQUIRE
CORPORATE SOLUTIONS

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

81

1    wanted to talk to someone about medical attention; is that

2    right?

3        A.   I'm trying to get medical attention.  I was

4    trying to get to the hospital.  They told me I had to

5    wait.

6        Q.   Who told you that?

7        A.   The police.

8        Q.   And so when did you realize they were police?

9        A.   When they put their vests on.

10       Q.   So when you came -- when did you --

11       A.   They sent a spokesperson up.

12       Q.   They sent a spokesperson up to talk to you?

13       A.   Yes, had any -- had anybody got shot?  They had

14   to know whether -- whose house got shot into.  They got

15   bullets out the wall immediately -- immediately, out the

16   trees.

17       Q.   Was it -- when they sent a spokesperson to speak

18   with you, was it still dark out?

19       A.   No.

20       Q.   No.

21       A.   It was daybreak.  It was about like that,

22   daybreak (pointing).

23       Q.   When you say, Like that, you're talking about

24   the --

25       A.   It was about 11:00, 12:00 o'clock.



ESQUIRE
CORPORATE SOLUTIONS

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Demetrius L. Baker                                    April 30, 2012

                                                              82

1          Q.   So you were saying it was almost as bright as it

2     is in --

3          A.   It was like 11:00, 12:00 --

4          Q.   -- Exhibit 22?

5          A.   Yes, ma'am.  It was like 11:00, 12:00 o'clock

6     when -- because I remember, because I said, Well, am I

7     going to be able to go to the hospital or something?  That

8     was about 12:00.  I didn't get down there until about

9     after 5:00.

10         Q.   To the hospital?

11         A.   Right, when they -- when they let us -- because I

12    couldn't walk.  My knee was busted.  My toe was broke, you

13    know, and to get the car back around, the car was in the

14    crime scene.  So the car -- they -- they was trying to

15    estimate, had the cars got shot up.

16         Q.   What hospital did you go to?

17         A.   I think it was Florida Hospital.  Was it Florida

18    Hospital?

19         Q.   And so you said you had a broken toe and a --

20         A.   Either Florida Hospital or Health Central.  I

21    know it was one of them -- I know it was one of them.

22         Q.   Okay.  You said you had a broken toe and

23    something with your knee?

24         A.   Yes, ma'am.  My arm was fractured; this whole arm

25    was fractured.  My nose was broke.



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

83

1       Q.    Have you given any of your medical records to the
2   Orange County Sheriff's Office?
3       A.    No.
4       Q.    Did you say, No?
5       A.    No.
6       Q.    Have you given your medical records to your
7   attorney?
8       A.    No.
9       Q.    When you went to the hospital, did you discuss
10  with the doctors that were treating you or the nurses that
11  were treating you, what had happened to you?
12      A.    I told them I was in a -- in the crossfire.
13  Police was shooting; shot and killed this boy.  That's
14  what I told them.  I was in the crossfire.  That's what I
15  was, in the crossfire.
16      Q.    Ms. Baker, I want to go back to the question that
17  I asked about, when you figured out that these men, that
18  had the guns, were police.  You said, When they put their
19  vests on.  Was it still dark outside at that point?
20      A.    No, ma'am.
21      Q.    What time do you think that was that you saw men
22  putting their vests on?
23      A.    It was -- the sun was coming out.
24      Q.    The sun was in the process of coming up?
25      A.    It had just -- it was just getting -- you know,



ESQUIRE
CORPORATE SOLUTIONS

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Demetrius L. Baker                                            April 30, 2012

84

1    it wasn't -- it was -- it was daybreak -- daybreak.  There

2    wasn't no more darkness in the sky.  I know that.  I don't

3    know what time it was, because I don't know what time it

4    was at that time.  Was it changed or changed back, at that

5    time?  I don't exactly know, but I wasn't looking at no

6    time.  I wasn't looking at the time.

7        Q.   So at that point you were out on the breezeway

8    already?

9        A.   No, I -- I was looking to try to see what kind of

10   injuries I sustained.  I was trying to see, was I shot?

11   Was I -- what was wrong with me, you know?  And my

12   children checked me over.  And, like I said, I had just

13   had surgery.  This whole side had done locked up.  It was

14   cold -- it was -- I got a blanket.

15        I -- I sat them out there.  They had chairs.  I

16   told them, y'all got to sit out there until I find out

17   what's going on.  You know, I don't know who that boy

18   belongs to, but he's somebody -- he's somebody mama -- you

19   know, somebody is his child --

20        Q.   Right.

21        A.   -- that's somebody's child.  I didn't even know

22   who he was.

23        Q.   So your children were sitting on chairs out in

24   that breezeway; is that right?

25        A.   Out in the breezeway, taking pictures, taking



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Demetrius L. Baker                                       April 30, 2012

85

1    pictures.  I said, Take as many pictures as you can --
2    take as many pictures as you can.  Do whatever you can.
3    Neighbors took pictures.  Everybody took out they stuff
4    and took pictures.  I said, Get all -- whatever you got
5    and take pictures.
6         Q.   Have you given any of those pictures to the
7    Orange County Sheriff's Office?
8         A.   No, I didn't.
9         Q.   Have you given any of those pictures to your
10   attorney?
11        A.   Yes.
12        Q.   Okay.  But you don't have any of those pictures
13   as we sit here today?
14        A.   They downloaded my phone.  I got -- it was on my
15   phone.
16        Q.   So were you inside your apartment until it was
17   daybreak or did you come out before the sun started to
18   come out?
19        A.   Yes, I come back.  I came -- I had to come out.
20        Q.   Well, I'm trying -- I'm just trying to figure out
21   where the sun was when you came out, at the time that you
22   came out?
23        A.   I was back and forth.  Like I said, it was cold.
24   And I used the bathroom.  When I went in the bathroom, I
25   had done messed up myself.  I had to go check.  I had to



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Demetrius L. Baker                                          April 30, 2012

86

1      go clean up.

2            Then I got me some warm -- warm -- warm -- some

3      real warm clothes on.  I dressed for the weather.  I put

4      on about five, six, seven socks, because I couldn't put no

5      shoe on, because my feet had done swole up -- they had

6      done swole up, my knees, everything.

7            Q.   So I'd like to know what you saw when you saw the

8      men putting their vests on; describe that for me?

9            A.   I said -- I said, Something going on.  I said,

10     They ain't just going to sit here and they just robbed

11     some damn body, you know.  I said, There's something going

12     up to it.  And the neighbors, all of us was sitting out

13     there.  And then there was a big -- right before -- like,

14     I say, about five, ten minutes before this big truck came,

15     it had FDLA (sic) on it -- or FDLA (sic) or whoever they

16     is, they on the side.  It was a lot of people.

17           It was a big truck, like a big camper like.

18     Several people bailed out; I say about six, seven.  Then

19     they had a van that came behind them.  All right.

20     Officers got in the van, left.  Cars went to disappearing,

21     left.  Cars -- cars even come from behind the building.

22     And I went, Damn, where them cars come from?

23           All right.  Before FDLA (sic) came in, I said,

24     Well, there's something fishy.  Them was the police?  I

25     know damn well that wasn't the police.  I said, You shot



ESQUIRE
CORPORATE SOLUTIONS

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Demetrius L. Baker                                          April 30, 2012

87

1     at me?  I said, You actually -- are you for real?  You

2     shot the fuck at me?  What you shoot at me for?

3          I was -- I was really mad.  I was very fucking

4     upset when I found out it was the police department, the

5     very same people who supposed to protect me.

6          Q.   Did someone tell you it was the police?

7          A.   They ain't even say they was the police.  This is

8     the strangest -- if you don't identify yourself, how you

9     going to know who the hell you running from?  When you

10    don't know who the hell you running from, you going to

11    keep on running.  I mean, I don't -- I don't know.

12    Different society -- different society.

13         Q.   Did anyone say to you, that's the police?

14         A.   They didn't even notify themselves as the police.

15    They didn't do it.

16         Q.   Did any of your neighbors or your children say to

17    you, that's the police?

18         A.   No, they didn't even know.

19         Q.   So describe to me when you saw these men putting

20    their vests on, where were they?

21         A.   In a huddle talking to each other.  They was

22    talking to each other.  One person came up out the

23    group -- to the group, and he had something.  And that's

24    when they was taking something out and they went to

25    putting -- some said it was the Police Department, some



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

ESQUIRE
CORPORATE SOLUTIONS

Demetrius L. Baker                                          April 30, 2012

88

1    said, Sheriff Department on the back.  All of them wasn't

2    the same -- all of them wasn't the same.  Trust that, they

3    wasn't the same.

4         And that's when I found it was very remarkable

5    that the police could -- could do something like that --

6    could do something like that to that boy and get away with

7    it.

8         Q.   Did any of these men, had they had masks on at

9    any point?

10        A.   Yes.

11        Q.   Did you see them take masks off?

12        A.   No.

13        Q.   So they had the masks on when you saw them

14   putting their vests on?

15        A.   Yes, they didn't never take their vests off --

16        Q.   Their masks, they never took them --

17        A.   -- yes, they never took their masks off.  The

18   only one that didn't have a mask was the one in the blue

19   truck -- the one in the blue truck.  I see -- if he had a

20   mask on, it was out there, but that's the only one I saw

21   with a mask off.  That's the only one I saw when his mask

22   came off.

23        Q.   So at daybreak these men still had masks on?

24        A.   Yes.

25        Q.   Did they still have masks on when the FDLE truck



Demetrius L. Baker                                        April 30, 2012

                                                                89

1    came?

2         A.    Yes.

3         Q.    And you never saw them take their masks off --

4         A.    No.

5         Q.    -- is that right?

6         A.    They got in vehicles and left.  It was six --

7    it -- that's why I don't understand, the stuff that you're

8    showing me, it wasn't near compatible to what was going on

9    down there.  Like those cars, there was more cars than

10   that.  It was more people than that.  It was more officers

11   than that.  It was more guns, you know.

12             Ain't no three people going to shoot them many

13   rounds in one person.  I mean, I -- I wouldn't think so.

14   I mean, I wouldn't imagine -- I don't know.  I haven't

15   been shot, but I wouldn't want to be shot by no people

16   like that.

17        Q.    I want to look at 22.  I'm going to show you

18   Exhibit 22.  And I think earlier we talked about apartment

19   complex lighting.  And so what I'm trying to find out is,

20   in that parking area that's sort of in between building

21   eight and building nine, do you see that area?

22        A.    Um-hum.

23        Q.    Was that part of the parking lot lit by apartment

24   complex lighting?

25        A.    Say that again?



ESQUIRE
CORPORATE SOLUTIONS

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Demetrius L. Baker                                          April 30, 2012

90

1      Q.   Was there apartment complex lighting that was

2   making that area lit at that time?

3      A.   Yes, they had lamp posts.  You could see lamp

4   posts in here.  There they go right here.  They've got

5   little poles right here, like that (pointing), see?

6      Q.   Oh.

7      A.   Oh, that's one up here.  The ones down here --

8   they got them down here too, but I don't know exactly.  I

9   can't tell you, Hey, there go the pole right there.  No, I

10  can't do that.  But I know I could see this one right here

11  on the corner.

12     Q.   You know what, I think I want to show you Exhibit

13  21.  I'm going to show you Exhibit 21.  This is Exhibit 21

14  I'm showing you.

15     A.   Okay.

16     Q.   So do you see a street lamp or an apartment

17  complex lamp on --

18     A.   Right here.

19     Q.   -- Exhibit 21?

20     A.   Right here.

21     Q.   So you're pointing to the lamp that's --

22     A.   Right by the --

23     Q.   -- right by Rico's truck?

24     A.   Um-hum.

25     Q.   So was that working on the morning of January 5,



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Demetrius L. Baker                                          April 30, 2012

91

1    2010?

2         A.   Yes, ma'am.  It's more too.

3         Q.   Pardon me?  There's more --

4         A.   Um-hum.

5         Q.   -- that's just not depicted on this picture?

6         A.   Right, they're over towards the parking lot.

7              MS. JACOBSON:  Okay.  All right.  Let me give

8         this back to the court reporter.  I'm going to just do

9         one more exhibit, to talk about the street lights.  So

10        what are we up to 23?

11             THE COURT REPORTER:  Yes.

12             (Defendant's Photograph Exhibit No. 23 was marked

13        for identification.)

14   BY MS. JACOBSON:

15        Q.   I'm going to show you Exhibit 23.  I think I only

16   have one copy of this, guys.  I'll pass it around.

17        A.   Where is this at?

18        Q.   Do you recognize Exhibit 23?

19        A.   Yes, that's the shed.

20        Q.   Do you recognize Exhibit 23 now, Ms. Baker?

21        A.   Yes, I'm -- I'm looking at it.

22        Q.   Do you see building nine on that picture?

23        A.   I want to say that's building nine, right?

24        Q.   You're pointing to the building that's almost --

25   let's see here --



ESQUIRE
CORPORATE SOLUTIONS

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Demetrius L. Baker                                    April 30, 2012

92

1     A.   All right.  If this is the shed, this got to be

2     the building, I'm assuming.  I'm -- I don't want to

3     speculate -- I don't want to speculate.  I don't want to

4     do that.  I know this is the shed.  I see the shed right

5     here.

6     Q.   Okay.

7     A.   Okay.  If I've got it like this, my building is

8     back this way.

9     Q.   Okay.  All right.  So I think I see what you're

10    talking about.  So --

11    A.   You see, because this here, this is -- this is

12    the shed right here -- right here where the car was in the

13    road, right there (pointing), right around the corner.

14    And then if you go around the corner, that's my apartment

15    right there.

16         MS. JACOBSON:  Okay.  So if we're looking at

17    Exhibit 23 -- and let me pass this around, so you guys

18    can see this, because, I'm sorry, I didn't make a copy

19    of this one.  I didn't think I was going to use it.

20    Sorry, I didn't make a copy.  I didn't think I was

21    going to get to this one.

22    BY MS. JACOBSON:

23    Q.   So, Ms. Baker, if we're looking at Exhibit 23 and

24    we see the shed on the upper left side and a field behind

25    it, you were indicating that the building in the lower



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

1       left corner was building nine; is that right?

2           A.   I'm assuming, yes.

3           Q.   Okay.  So all I want to know is, you had just

4       mentioned -- when we were talking about Exhibit 21, you

5       had mentioned that there were some more lighting --

6           A.   Um-hum.

7           Q.   -- in the parking area.

8           A.   There's good lighting out there, you know, in the

9       parking lot.  The lighting is not a problem for you not to

10      see out there, you know.

11          Q.   What I wanted to see on Exhibit 23 is, do you see

12      some of the lighting that you were just describing when we

13      were talking about that other exhibit, Exhibit 21?

14          A.   Do you want me to know where each light is at, at

15      the complex?

16          Q.   No, not every light at the complex.

17          A.   In front of the building?

18          Q.   I'm just talking about the ones in front of

19      building nine; do you see those reflected on Exhibit 23?

20          A.   Yes, I can see them.

21          Q.   So there's a couple of lights on the -- sort

22      of -- the grass --

23          A.   Um-hum.

24          Q.   -- parking island that's in between the parking

25      spots; is that right?



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

94

1        A.    Um-hum.   There's some over here.

2        Q.    Could you go ahead and just circle the parking

3   lot lights that you see on Exhibit 23?

4        A.    (Witness complies.)

5        MS. NATALIE JACKSON:   And I'm going to object to

6        Exhibit 23 as not being an accurate picture of the

7        scene.

8        THE WITNESS:   Yes, it's really not a accurate

9        picture.   There's more lighting towards the front and

10       then up on the side, you know, it's really -- that's

11       just all I could see in this picture.

12   BY MS. JACOBSON:

13       Q.    Okay.   Thank you.   Here, I'll let you keep the

14   yellow folder and I'll take the pen.   So let me ask you,

15   Ms. Baker, I understand that Exhibit 23, there's some

16   lighting that's not shown in this picture; is that right?

17       A.    Yes, ma'am.

18       Q.    But the circles that you have made on Exhibit 23,

19   that is an accurate picture of those lights; is that

20   right?

21       A.    From what I could see in that picture, because

22   you've got a shadow -- you've got that shadow in there

23   and, you know, it's -- like I say, it's more lights than

24   that.   It's lit up pretty good at night, you know.

25       MS. JACOBSON:   Okay.   Thank you.   All right.



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

95

1          Ms. Baker, I don't have anymore questions.

2               MS. NATALIE JACKSON:  I don't have any questions.

3               MS. JACOBSON:  Angelique, Rogell?

4                         CROSS-EXAMINATION

5     BY MS. ANGELIQUE JACKSON:

6          Q.   I just have one quick question.  In regards to

7     the damage to Rico's truck, did you ever hear of bullet

8     holes?

9          A.   All those cars right there sustained bullet

10    holes, behind that car -- behind his vehicle, sustained

11    bullets.  They had to get repaired too.

12         Q.   Do you have any contact information for Mr. Rico

13    or do you know his last name?

14         A.   I had it -- I had it in the beginning.  I

15    don't -- I don't remember his last name, but I just moved

16    away from there, but I know his people stay over there.  I

17    could find out, you know.  If I really had to, I could

18    really find out.  He was incarcerated.

19         Q.   Okay.  You mentioned that there was a gentleman

20    that ran past or someone ran past you -- excuse me.

21    Someone ran past you as you got down the stairs.  Were you

22    able to take a look or did you get a good look at that

23    person?

24         A.   He was a younger person.  He was young, around

25    jitterbug age, young, like the jits, real young.  He had



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

ESQUIRE
CORPORATE SOLUTIONS

Demetrius L. Baker                                    April 30, 2012

96

1      little twigs in his hair.

2            MS. ANGELIQUE JACKSON:  All right.  That was

3         pretty much all I wanted clarification on.  Thank you.

4                      REDIRECT EXAMINATION

5      BY MS. JACOBSON:

6         Q.   Could I just ask one question:  You said he had

7      twigs in his hair?

8         A.   Yes, ma'am.

9         Q.   What does that mean?

10        A.   Like kuka bug things, them children be rolling up

11     their hair.  I don't know.  How I know it's twigs, because

12     I made my son take them out of his hair, you know what I'm

13     saying?

14        Q.   Some kind of twisted hair style --

15        A.   Yes -- yes, ma'am.

16        Q.   -- is what you mean?

17        A.   He was real young -- he was real young -- he was

18     a real young boy.

19            MS. JACOBSON:  I have no further questions.

20            MS. NATALIE JACKSON:  No questions.

21            MS. ANGELIQUE JACKSON:  No questions.

22            MS. JACOBSON:  Ms. Baker, you have the

23         opportunity, after she transcribes everything she took

24         down here today, to read it and make sure she got it

25         right.  Or you can say that you don't want to do that.



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Demetrius L. Baker                                      April 30, 2012

97

1       It's your option.

2               MS. NATALIE JACKSON:  She'll read.

3               THE COURT REPORTER:  Do you need this

4       transcribed?

5               MS. JACOBSON:  Yes, I do.

6               (Thereupon, the deposition was concluded at

7       4:17 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

98

1                        CERTIFICATE OF OATH

2      THE STATE OF FLORIDA,    )

3      COUNTY OF ORANGE.        )

4

5

6          I, Tomeka Thompson, Court Reporter, Notary Public,

7      State of Florida, certify that DEMETRIUS L. BAKER

8      personally appeared before me on the 30th day of April,

9      2012, and was duly sworn.

10

11         WITNESS my hand and official seal this 2nd day of May,

12     2012.

13

14

15         *Tomeka Thompson*

16         ---------------------------------------

           Tomeka Thompson

17         Notary Public - State of Florida

           My Commission EE 153421

18         My Commission Expires 12/18/15

19

20

21

22

23

24

25



ESQUIRE
CORPORATE SOLUTIONS

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Demetrius L. Baker                                                April 30, 2012

99

                        CERTIFICATE OF REPORTER

1

2

3       THE STATE OF FLORIDA,    )

4       COUNTY OF ORANGE.         )

5

6

7               I, Tomeka Thompson, Court Reporter, State of
        Florida at Large, do hereby certify that the

8       aforementioned witness was first duly sworn to testify to
        the whole truth; that I was authorized to and did report

9       said deposition in stenotype; and that the foregoing
        pages, numbered 1 to 97, inclusive, are a true and correct

10      transcription of my shorthand notes of said deposition.

11              I further certify that said deposition was taken
        at the time and place hereinabove set forth and that the

12      taking of said deposition was commenced and completed as
        hereinabove set out.

13

                I further certify that I am not an attorney or

14      counsel of any of the parties, nor am I a relative or
        employee of any attorney or counsel of any party connected

15      with the action, nor am I financially interested in the
        action.

16

                The foregoing certification of this transcript

17      does not apply to any reproduction of the same by any
        means unless under the direct control and/or direction of

18      the certifying reporter.

19              IN WITNESS WHEREOF, I have hereunto set my hand
        this 2nd day of May, 2012.

20

21

22                      ----------------------------------
                        Tomeka Thompson

23                      Notary Public - State of Florida
                        My Commission EE 153421

24                      My Commission Expires 12/18/15

25



2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Demetrius L. Baker                                    April 30, 2012

100

```
 1              DEPOSITION ERRATA SHEET

 2

 3      Our Assignment No. 289726

 4      Case Caption: Tiffanye Breedlove, et al.

 5      vs. Hartford Life and Accident Insurance Company

 6

 7          DECLARATION UNDER PENALTY OF PERJURY

 8            I declare under penalty of perjury

 9      that I have read the entire transcript of

10      my Deposition taken in the captioned matter

11      or the same has been read to me, and

12      the same is true and accurate, save and

13      except for changes and/or corrections, if

14      any, as indicated by me on the DEPOSITION

15      ERRATA SHEET hereof, with the understanding

16      that I offer these changes as if still under

17      oath.

18            Signed on the _____ day of

19      _____, 20_____.

20

21      _____

                Demetrius L. Baker

22

23

24

25
```



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Demetrius L. Baker                                          April 30, 2012

101

1                        DEPOSITION ERRATA SHEET

2        Page No._____Line No._____Change to:_____

3        _____

4        Reason for change:_____

5        Page No._____Line No._____Change to:_____

6        _____

7        Reason for change:_____

8        Page No._____Line No._____Change to:_____

9        _____

10       Reason for change:_____

11       Page No._____Line No._____Change to:_____

12       _____

13       Reason for change:_____

14       Page No._____Line No._____Change to:_____

15       _____

16       Reason for change:_____

17       Page No._____Line No._____Change to:_____

18       _____

19       Reason for change:_____

20       Page No._____Line No._____Change to:_____

21       _____

22       Reason for change:_____

23

24       SIGNATURE:_____DATE:_____

                     Demetrius L. Baker

25



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Demetrius L. Baker                                            April 30, 2012

102

1                    DEPOSITION ERRATA SHEET

2      Page No._____Line No._____Change to:_____

3      _____

4      Reason for change:_____

5      Page No._____Line No._____Change to:_____

6      _____

7      Reason for change:_____

8      Page No._____Line No._____Change to:_____

9      _____

10     Reason for change:_____

11     Page No._____Line No._____Change to:_____

12     _____

13     Reason for change:_____

14     Page No._____Line No._____Change to:_____

15     _____

16     Reason for change:_____

17     Page No._____Line No._____Change to:_____

18     _____

19     Reason for change:_____

20     Page No._____Line No._____Change to:_____

21     _____

22     Reason for change:_____

23

24     SIGNATURE:_____ DATE:_____

                   Demetrius L. Baker

25



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com