UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**TIFFANYE BREEDLOVE as personal representative of the estate of Torey Breedlove, deceased, TAMESHA PRINCE on behalf of T.B.1, SHARELLE TYSON on behalf of T.B.2, and TERESA JONES on behalf of T.B.3 and T.B.4,**

      **Plaintiffs,**

v.                                                 Case No: 6:11-cv-991-Orl-28TBS

**HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY,**

      **Defendant.**
_____/

## ORDER

Plaintiffs, comprising the estate of Torey Breedlove and four of his beneficiaries (collectively "the Estate"), have sued Defendant, Hartford Life and Accident Insurance Company ("Hartford"), for breach of an accidental death insurance policy issued to Torey Breedlove ("Breedlove"). Breedlove died from gunshot wounds sustained during an altercation with police. The Estate and Hartford have both filed motions for summary judgment.[1] For the reasons explained below, the Estate's Motion for Summary Judgment is **DENIED** and Hartford's Motion for Summary Judgment is **GRANTED**.

---

[1] The relevant filings before the Court are Hartford's Motion for Summary Judgment (Doc. 49), the Estate's Opposition (Doc. 59), Hartford's Reply (Doc. 66), the Estate's Motion for Summary Judgment (Doc. 55), Hartford's Opposition (Doc. 65), and the Estate's Reply (Doc. 68).

## I. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a motion for summary judgment, the Court construes the facts and all reasonable factual inferences in the light most favorable to the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). However, when faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." Gargiulo v. G.M. Sales, Inc., 131 F.3d 995, 999 (11th Cir. 1997).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." Sawyer v. Southwest Airlines Co., 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51 (1986)).

"[A]t the summary judgment stage, the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'" Sawyer, 243 F. Supp. 2d at 1262 (quoting Anderson, 477 U.S. at 251-52).

## II.  Background

Hartford insured Breedlove under a group accidental death and dismemberment insurance policy ("the Policy") that Hartford issued to Publix Employees Federal Credit Union.  (Am. Compl. ¶ 10 and Ex. B).  The Policy provides that "[if] Your Injury results in any of the following losses [including death] within 365 days after the date of the accident, We will pay the sum stated . . . ."  (Id., Ex. B at 4).  The Policy defines "Injury" as "bodily injury resulting directly from accident and independently of all other causes."  (Id.)  The Policy also excludes from coverage any "Injury sustained while committing or attempting to commit a felony."  (Id.).

Breedlove died on January 5, 2010 from gunshot wounds sustained during an altercation with police.  Early in the morning of January 5, 2010, members of the Orange County Sheriff's Office ("OCSO") conducted physical and electronic surveillance on a stolen Dodge Ram ("the stolen truck"), which had been found the day before parked in the Alta Vista Westgate apartment complex ("the Complex").  (Davis Dep. at 17-19; Schmeltzer Aff. ¶ 4).  Officer Richard Schmeltzer stated that at the time he found the stolen truck, "its ignition had been removed and placed back in which . . . is consistent with the ignition mechanism having been bypassed."  (Schmeltzer Aff. ¶ 5).  Several officers have further explained that "Breedlove was a suspect in a series of tire and rim thefts from 2009 involving the use of stolen Dodge Ram trucks to transport the tires and rims," (Davis Dep. at 7-8), and that Breedlove's personal vehicle, a GMC Yukon Denali ("the Denali") was found at the same Complex where the stolen truck had been parked.  (Davis Dep. at 18-19; Leone Aff. ¶¶ 3-4).

At 2:00 a.m. on January 5, 2010, an electronic tracking device that had been placed on the stolen truck alerted OCSO that the truck was on the move from its location at the Complex. (Schmeltzer Aff. ¶ 6; Volkerson Aff. ¶¶ 3-4). Ten police officers waited at the Complex to arrest the suspect when the stolen truck returned. (Davis Dep. at 18, 21-23). Two officers state that when the stolen truck returned, they observed Breedlove parking the stolen truck and watched him exit from the driver's side. (Leone Aff. ¶ 6; Gorberg Aff. ¶ 7). These officers explain that after parking the truck, Breedlove placed items into the back of his Denali, at which time Deputy Leone communicated over his radio for other deputies to "move in if they hadn't already begun to do so." (Leone Aff. ¶ 7).

According to the police officers' accounts of the events that followed, Breedlove quickly moved into his Denali and started the engine as two officers ordered him to stop with guns drawn. (Leone Aff. ¶¶ 8, 10, 11; Gorberg Aff. ¶ 10). Both of those officers state that they were wearing tactical vests with a star on the front and the word "SHERIFF" printed in large letters on the front and back. (Gorberg Aff. ¶ 5; Leone Aff. ¶ 4, 10). One of those officers states that he made eye contact with Breedlove and yelled "Police, put your hands up." (Leone Aff. ¶ 11). The other officer explains that despite their repeated verbal commands, Breedlove "floored the Denali in reverse" and within seconds "collided with [an officer's] unmarked Ford Explorer," and then went "nose to nose with [another officer's] unmarked blue F-150 truck." (Gorberg Aff. ¶¶ 11, 13, 14). Several officers explain that they then heard the Denali's engine revving and saw it push forward against the F-150 truck, with its tires in the direction of officers on foot.

4

(Leone Aff. ¶ 15; Schmeltzer Aff. ¶ 12; Volkerson Aff. ¶ 18; Gorberg Aff. ¶ 15).  Some of the officers then fired toward Breedlove.  (Leone Aff. ¶ 16).

One officer states that after this first volley of shots, he said to Breedlove "Police, put your hands up," and that other deputies gave Breedlove similar commands to put his hands up.  (Volkerson Aff. ¶ 20).   Several officers state that Breedlove then raised one or both hands and said something to the effect of "my hands are up" or "they're up." (Leone Aff. ¶ 17; Schmeltzer Aff. ¶ 13; Volkerson Aff. ¶¶ 20-21; Gorberg Aff. ¶ 17). These officers then heard the Denali's engine revving, saw Breedlove put his hands down, noticed the Denali's wheels were turned in the direction of the officers approaching to apprehend Breedlove, and saw the Denali strike the F-150 truck again and push it back against another officer's vehicle.  (Leone Aff. ¶¶ 17-18; Schmeltzer Aff. ¶¶ 14-15; Volkerson Aff. ¶¶ 22, 24; Gorberg Aff. ¶¶ 17-18).  The officers then fired a second volley of shots toward Breedlove, after which Breedlove did not move.  (Gorberg Aff. ¶ 19).  Breedlove died from multiple gunshot wounds.  (Am. Compl. ¶ 12).  An OCSO deputy states that he later searched Breedlove's Denali and found a stolen iPod. (Nazzaro Aff. ¶ 5).

Following Breedlove's death, the personal representative of Breedlove's estate applied to Hartford for insurance benefits under the Policy.  Hartford did not pay any benefits and the Estate subsequently sued Hartford for the benefits allegedly due.

### III. Analysis

**A. Hartford's Motion for Summary Judgment**

Hartford moves for summary judgment on the grounds that Breedlove's death did not "result directly from accident and independently of all other causes"[2] and that even if it had, the Policy specifically excludes his death from coverage because his death occurred during the commission of one or more felonies. (Def.'s Mot. Summ. J. at 3). Hartford argues that the Court "has many felonies from which to choose," (id. at 18), including felony theft and a string of alleged felonies related to Breedlove's actions toward the police.[3] Because the Court concludes that there is no genuine dispute of fact as to whether Breedlove's death occurred during the commission of felony theft, the Court need not address whether his death constituted an "Injury" under the Policy or whether Breedlove's actions toward the police themselves constituted a felony.[4]

Under Florida law:

> A person commits theft if he or she knowingly obtains or uses, or endeavors to obtain or to use, the property of another with intent to, either temporarily or permanently:
>
> (a) Deprive the other person of a right to the property or a benefit from the property.
>
> (b) Appropriate the property to his or her own use or to the use of any person not entitled to the use of the property.

---

[2] Hartford argues that Breedlove's death was not an accident because it was foreseeable that the police would fire upon him in response to the aggravated assault he is alleged to have committed while driving his Denali. (Def.'s Mot. Summ. J. at 3, 13-17).

[3] These felonies include alleged instances of aggravated assault on the police and fleeing/eluding the police.

[4] Resolving these issues would require the Court to determine whether there is a genuine dispute of fact as to Breedlove's allegedly aggressive actions toward police officers. The Court notes that the Estate has also filed a civil rights action against the officers involved in Breedlove's death, which may involve similar issues of fact. See Estate of Torey Adrell Breedlove v. Demings, Civil Action No. 6:11-cv-2027-ORL-31KRS.

§ 812.014(1), Fla. Stat.  The phrase "obtains or uses" is statutorily defined to include "any manner of . . . [t]aking or exercising control over property [or] [m]aking any unauthorized use, disposition, or transfer of property."  § 812.012(3), Fla. Stat.  Theft of a motor vehicle is a felony, see § 812.014, Fla. Stat., and "proof that a person was in possession of a stolen motor vehicle and that the ignition mechanism . . . had been bypassed . . ., unless satisfactorily explained, gives rise to an inference that the person in possession of the stolen motor vehicle knew or should have known that the motor vehicle had been stolen," § 812.022(6), Fla. Stat.

There is no genuine dispute that Breedlove drove and parked the stolen truck and that the truck's ignition had been bypassed.  Two police officers state that they observed Breedlove parking the stolen truck and watched him exit out of the driver's side.  (Leone Aff. ¶ 6; Gorberg Aff. ¶ 7).  The Estate, however, attempts to create an issue of fact by arguing that certain evidence calls into question the officers' identification of Breedlove as the driver.

First, the Estate argues that there were "multiple suspects" in the truck, with the implication being that one of the other suspects may have driven the stolen truck.  (Pls.' Opp'n Summ. J. at 3).  To this end, the Estate points out that a resident of the Complex testified that she saw a "young boy" run past her at the time of the altercation with police.  (Baker Dep. at 96-97).  The Estate also points to a transcript of a police radio transmission showing that an officer said "multiple people in the car" during the altercation:  "County Trap 10, shots fired. (inaudible), uh multiple people in the car. Hands up, hands up."  (Ex. B to Pls.' Opp'n Summ. J.).

This evidence does not create a genuine dispute about who was driving the truck. The fact that a "young boy" was in the Complex's parking lot at the time of the incident does not give rise to an inference that the young boy was driving the stolen truck. And the statement "multiple people in car" is virtually meaningless without context. The transcript does not indicate who made this statement or from what perspective.[5]

The Estate also points to the deposition of an officer who suggested that the officers who identified Breedlove may not have had a clear view of him exiting the stolen truck. Sergeant Davis ("Davis") was the officer coordinating the police action at the Complex the morning of the altercation. In explaining why there was a delay during which Breedlove was able to get from the stolen truck to the Denali, Davis stated, "It was dark in the parking lot where the detectives were set up . . . . I guess they didn't have a clear view in the darkness and they were unsure whether or not he had actually gotten out." (Davis. Dep. at 30-31). But Davis also stated (1) that he "was at the front gate during the entire incident, so [he] never saw everything," (2) that he only arrived on the scene "after the shots were fired," and (3) that he does not "know the exact events that transpired." (Id. at 28, 31). This testimony makes clear that Davis could not provide a firsthand account of whether the officers who identified Breedlove had a clear view of him parking and exiting the stolen truck. The Estate's attempt to create a genuine dispute out of Davis's mere speculation therefore fails.

There is also no genuine dispute as to whether the ignition of the stolen truck had been bypassed. Officer Richard Schmeltzer stated that at the time he found the stolen

---

[5] Hartford also argues that this transcript is inadmissible hearsay, but the Court finds that the transcript would not create a genuine issue of fact even if admitted.

truck "its ignition had been removed and placed back in which . . . is consistent with the ignition mechanism having been bypassed." (Schmeltzer Aff. ¶ 5). In an attempt to create an issue of fact as to whether the stolen truck's ignition had actually been bypassed, the Estate points to the vehicle disposition report of the officer who ordered the stolen truck towed for processing. (Pls.' Opp'n Summ. J. at 2-3). In that report, the officer indicates that the ignition was "worn."[6] (Ex. A to Pls.' Opp'n Summ. J.). But the owner of the stolen truck has confirmed that when she retrieved the truck from law enforcement, she "could not use [her] keys to start the Dodge Ram because of the damage to the ignition mechanism, *which had been bypassed.*" (Reade Decl. ¶ 3 (emphasis added)).

Accordingly, there is no genuine dispute that Breedlove was driving the stolen truck and that its ignition had been bypassed. Moreover, the Estate has not offered any evidence to rebut the consequent statutory presumption that Breedlove knew the truck was stolen on account of the bypassed ignition. Nor has the Estate otherwise presented any evidence to dispute Breedlove's intent to appropriate the truck for his own use and to deprive the owner of her right to it. Therefore, no genuine dispute exists as to whether Breedlove was committing felony theft at the time of his altercation with police.

Additionally, there is no genuine dispute that Breedlove was committing felony theft of an iPod at the time of his altercation with Police. OCSO deputy Timothy Nazzaro affirms that he found a recently stolen Apple iPod in Breedlove's Denali while

---

[6] Hartford argues that this document is inadmissible because it is not authenticated. Nonetheless, even if the document were admissible, it does not create an issue of fact.

conducting an inventory search of the vehicle on January 15, 2010.[7] (Nazzaro Aff. ¶ 4, 5). Under Florida law, "proof of possession of property recently stolen, unless satisfactorily explained, gives rise to an inference that the person in possession of the property knew or should have known that the property had been stolen." § 812.022(2), Fla. Stat. While theft of the iPod might ordinarily be petit theft, see § 812.014(2)(e)-(3)(a), Fla. Stat., Florida law provides that "[a] person who commits petit theft and who has previously been convicted two or more times of any theft commits a felony of the third degree." § 812.014(3)(c), Fla. Stat. Breedlove had been convicted two or more times of theft. (See Certified Conviction, Ex. 2 to Def.'s Reply).

In an attempt to create an issue of fact concerning Breedlove's possession of the stolen iPod, the Estate argues that it has presented evidence of multiple people in the Denali and that a "chain of custody issue" may exist as to whether the iPod was in the Denali at the time of Breedlove's death. (Pls.' Opp'n Summ. J. at 5, 17). To support its argument that multiple people were in the Denali, the Estate again points to the radio transcript containing the statement "multiple people in car" and to the testimony of the resident who saw a "young boy" run past her during Breedlove's altercation with police. (Id. at 3). As explained before, the radio transcript is virtually meaningless without context. And the mere fact that a young boy was in the parking lot at the time of the incident does not give rise to a reasonable inference that the boy was in the Denali. Moreover, an officer driving one of the vehicles that blocked in the Denali during the altercation affirms that he observed no one else in the Denali. (Ela Aff. ¶ 9).

---

[7] The iPod had a name and telephone number etched on the back. (Nazzaro Aff. ¶ 5). The owner of the iPod had reported to the Seminole County Sherriff's Office that his vehicle had been burglarized and that the iPod had been stolen from his vehicle less than 48 hours prior to Breedlove's death. (Id. ¶ 7).

The Estate also argues that there is a "possible chain of custody issue" by pointing out that the OCSO officer who found the stolen iPod did not search the vehicle until January 15, 2010, ten days after the incident.[8] The fact that the OCSO officer searched the Denali ten days after the incident does not itself give rise to an inference of a chain of custody issue. Furthermore, Hartford has presented evidence showing that police officers secured the Denali at the time of the incident and ensured the Denali remained in secured facilities until it had been searched. (Ela Aff. ¶¶ 7, 8; Nazzaro Aff. ¶¶ 2, 3; Parks Decl. ¶ 4). In fact, a Florida Department of Law Enforcement crime analyst states that she had also inventoried the Denali at a secured facility prior to the time the OCSO officer found the stolen iPod and that she "found two Apple iPod Touches—one in the glove box and one on the seat of the left rear passenger compartment." (Parks Decl. ¶ 5).

Accordingly, there is no genuine dispute that Breedlove was also committing felony theft of an iPod at the time of his altercation with police. There is no genuine dispute that Breedlove was in possession of the recently stolen iPod at the time of his death, and because the Estate has not presented any evidence to explain why Breedlove had the stolen iPod in his possession, it is presumed that Breedlove knew the iPod was stolen. The Estate also has not otherwise presented any evidence to dispute Breedlove's intent to appropriate the stolen iPod for his own use and to deprive the owner of his right to it.

In sum, there is no genuine dispute that Breedlove was committing felony theft of the truck and felony theft of the iPod at the time of his death. Because Breedlove was

---

[8] The Estate incorrectly states that the stolen iPod "was found 14 days after the incident." (Pls.' Opp'n Def.'s Mot. Summ. J. at 17). Breedlove's altercation with police happened on January 5, 2010, (id. at 1), and Deputy Nazzaro affirms that he found the iPod on January 15, 2010, (Nazzaro Aff. ¶¶ 4-5).

killed while committing at least one felony, his death is excluded from coverage under the Policy.

### B. The Estate's Motion for Summary Judgment

The Estate has separately moved for summary judgment seeking "judicial determination that (1) the subject policy was valid on January 5, 2010, (2) a legal designation of the beneficiary, and (3) that there are no pleaded exclusions to deny benefits due under the policy." (Pls.' Mot. Summ. J. at 1).

Notwithstanding the Estate's argument to the contrary, Hartford did plead that the Policy excluded recovery. Hartford stated in its Answer and Affirmative Defenses (Doc. 30) that "Plaintiffs' recovery, if any, is limited by . . . exclusions . . . of the Policy" and that "decedent's death . . . was excluded from coverage under the Policy." (Answer at 4).

Moreover, the Estate has otherwise had fair notice of the specific felony exclusion at issue. The Policy itself contains an express "Exclusions" section that lists the Policy's eight exclusions, including an exclusion for "Injury sustained while committing or attempting to commit a felony." (Ex. B to Am. Compl. at 5). Both Hartford's Motion to Dismiss (Doc. 16) and its Motion to Dismiss the Amended Complaint (Doc. 31) argued that the Policy "excludes from coverage any injury 'sustained while committing or attempting to commit a felony.'" (Mot. Dismiss at 1, 3 n.2; Mot. Dismiss Am. Compl. at 1, 3 n.2). And as Hartford points out, the felony exclusion has been the subject of discovery by the Estate throughout the litigation. The Estate's interrogatories asked Hartford to "specifically state which felony(ies) the decedent is alleged to have been in the commission of and/or have committed." (Ex. 6

to Def.'s Opp'n Summ. J. ¶ 7).  The Estate's requests for admission to Hartford also inquired whether Hartford had evidence "that the deceased was in possession of stolen property" or "that the deceased was on felony probation."  (Ex. 5 to Def.'s Opp'n Summ. J. at 3, 4).

In sum, Hartford did plead that the Policy excluded recovery, and the Estate had fair notice that the felony exclusion in particular was central to Hartford's defense. Because there is no genuine issue of fact as to whether the felony exclusion bars recovery for Breedlove's death, the issues of the policy's validity and the legal designation of the beneficiary are moot.  Therefore, the Estate's Motion for Summary Judgment is **DENIED**.

### IV.  Conclusion

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** as follows:

1. Hartford's Motion for Summary Judgment (Doc. 49) is **GRANTED**.

2. The Estate's Motion for Summary Judgment (Doc. 55) is **DENIED**.

3. All other pending motions are **DENIED** as moot.

4. The Clerk is directed to enter a judgment providing that Plaintiffs take nothing from Defendant on Plaintiffs' claims.  Thereafter, the Clerk shall close this file.

**DONE** and **ORDERED** in Orlando, Florida on October 30, 2012.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record